AC-1999-20                                                          1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Acción Civil<br>    Peticionario<br><br>    v.<br><br>Estado Libre Asociado de Puerto Rico,<br>et al<br>    Recurridos | Apelación<br><br>2000 TSPR 29 |

Número del Caso: AC-1999-0020

Fecha: 25/02/2000

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Guillermo Arbona Lago

Abogado de la Parte Peticionaria: Lcdo. Nelson Rosario Rodríguez
                                  Lcdo. Roberto Ariel Fernández

Abogado de la C.E.E.: Lcdo. Ramón L. Walker Merino

Oficina del Procurador General: Hon. Gustavo A. Gelpí,
                                Procurador General
                                Lcda. Karen Pagán Pagán,
                                Procuradora General Auxiliar

Abogado del Comisionado del PNP: Lcdo. José A. Carlo Rodríguez

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Partido Acción Civil

        Peticionario

              v.                          AC-1999-20        Certiorari

Estado Libre Asociado de
Puerto Rico, et al

        Recurridos


Opinión del Tribunal emitida por el Juez Asociado señor Hernández Denton


        San Juan, Puerto Rico, a 25 de febrero de 2000.


        El Partido Acción Civil nos solicita la revocación de una sentencia del Tribunal de Circuito de Apelaciones en la cual se sostuvo la constitucionalidad de los Arts. 3.001(3) y 3.002 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada.  16 L.P.R.A. ss. 3101(3) y 3102.

        Por considerar que dichas disposiciones no adolecen de vicio constitucional alguno, confirmamos.

I

El 6 de octubre de 1998, el Partido Acción Civil, una agrupación política interesada en convertirse en un partido por petición para participar en las elecciones del año 2000, presentó un recurso de sentencia declaratoria e *injunction* preliminar y permanente ante el Tribunal de Primera Instancia, impugnando la constitucionalidad de los Arts. 3.001(3) y 3.002 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. ss. 3101(3) y 3102. Dichas disposiciones requieren que las peticiones para inscribir un partido por petición sean juramentadas ante notario público y presentadas ante la Comisión Estatal de Elecciones (en adelante la C.E.E.) dentro del término de siete días de haberse tomado el juramento en cuestión. Solicitó además, que la C.E.E. adoptara para la inscripción del Partido Acción Civil como partido por petición los mismos requisitos exigidos a los candidatos que interesan participar en las primarias internas de los partidos políticos ya inscritos.[1]

El Tribunal de Primera Instancia desestimó la demanda incoada. Sostuvo la constitucionalidad de los requisitos impuestos por los artículos 3.001(3) y 3.002 de la Ley Electoral, por considerar que las diferencias entre los distintos requisitos de ley establecidos para la inscripción de un partido político por petición y para los trámites primaristas de un partido ya inscrito, responden a intereses válidos y legítimos del Estado. Concluyó que para su inscripción como partido político por petición, el Partido Acción Civil no podía exigir de la C.E.E. un trato igual al que se concede a los partidos ya inscritos.

Inconforme con tal determinación, el Partido Acción Civil acudió ante el Tribunal de Circuito de Apelaciones. Sometido el recurso, el Partido Acción Civil presentó una moción en auxilio de jurisdicción

---

[1] El Art. 4.011 de la Ley Electoral, 16 L.P.R.A. sec. 3161, dispone que dichas peticiones sean juramentadas ante los funcionarios autorizados por ley para tomar juramentos, y ante cualquier elector autorizado por la C.E.E. para llevar a cabo esa función a petición de cada candidato en primarias.

solicitando se autorizara la recolección de endosos utilizando notarios *ad hoc* designados por la C.E.E. y que se ordenara a la C.E.E. recibir todos los endosos, aún aquellos presentados luego del término de siete días establecido en ley. El tribunal apelativo confirmó el dictamen recurrido.

Oportunamente, el Partido Acción Civil presentó ante nos recurso de apelación, acompañado con una moción en auxilio de jurisdicción para que dejásemos sin efecto el Artículo 3.001(3) de la Ley Electoral en cuanto al requisito de que los endosos de inscripción sean juramentados ante notario público. Acogimos el recurso de apelación como uno de *certiorari,* pero denegamos la moción en auxilio de jurisdicción[2].

En síntesis, el Partido Acción Civil alega que erraron los tribunales sentenciadores: (1) al concluir que las disposiciones de la Ley Electoral impugnadas no violan los derechos de asociación, expresión y al voto efectivo bajo la doctrina de acceso a la papeleta; (2) al desestimar sumariamente la demanda; (3)  al desestimar la demanda sin celebrar vista evidenciaria, ya que esto alegadamente violó sus derechos constitucionales por no haberse cumplido con los requisitos del debido proceso de ley procesal; (4) al concluir que no se viola la disposición constitucional sobre  Igual Protección de las Leyes al exigir que sean abogados los que notaricen los endosos de los partidos por petición.

Examinados los autos originales, así como los extensos alegatos y escritos de todas las partes, resolvemos.

II

La correcta adjudicación de los hechos ante nos requiere que examinemos y armonicemos el importante papel que juegan los partidos políticos en nuestra jurisdicción, con la obligación de la Asamblea Legislativa de salvaguardar el derecho a que los electores puedan

---

[2]  Posteriormente a la expedición del *certiorari* el Partido Acción Civil presentó tres mociones en auxilio de jurisdicción, las cuales fueron denegadas. Resoluciones del Tribunal Supremo de Puerto Rico de 4 de agosto de 1999, de 27 de octubre de 1999 y de 4 de enero de 2000.

ejercer su voto en el contexto de unas elecciones justas y libres de fraude, confusión y caos.

La Constitución del Estado Libre Asociado de Puerto Rico reconoce expresamente la importancia de los partidos políticos dentro de nuestra organización de gobierno, al establecer la fórmula de garantía de representación minoritaria en la Legislatura. Art. III, Sec. 7, Const. E.L.A.; Silva v. Hernández Agosto, 118 D.P.R. 45 (1986). En el ejercicio de nuestra función adjudicativa, esta Curia ha reconocido que los partidos políticos han asumido un rol cada vez más extenso e importante en el funcionamiento cotidiano de los estados modernos, y que existe una correlación entre el sistema de partidos y el ordenamiento constitucional. Fuster v. Busó, 102 D.P.R. 327 (1974).

La existencia de los partidos políticos en nuestra jurisdicción está íntimamente ligada al derecho que tiene cada ciudadano de participar en el proceso electoral, elemento base de nuestro sistema democrático, que surge del derecho al voto, consagrado expresamente en nuestra Carta de Derechos. Art. II, Sec. 2, Const. E.L.A. En nuestro esquema de derecho constitucional, el derecho al voto no tan sólo comprende el derecho del elector a votar en las elecciones, sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contemporáneas del elector. Ortiz v. Barreto, 110 D.P.R. 84 (1980). El derecho al voto, en su dimensión de participación política, comprende el derecho a formar agrupaciones para participar en el proceso electoral.

Aunque es indudable el carácter fundamental del derecho a votar de una manera determinada, y el derecho a formar agrupaciones para propósitos políticos a través de una papeleta electoral, este derecho no es absoluto. Ramírez de Ferrer v. Mari Bras, res. el 18 de noviembre de 1997, 144 D.P.R.__ (1997), Opinión concurrente del Juez Presidente señor Andréu García; Véanse a modo ilustrativo Munro v. Socialist Workers Party, 479 U.S. 189 (1986); Burdick v. Takushi, 504 U.S.___, 119 L.Ed.2d 245 (1992). Corresponde a la Asamblea

Legislativa, en el ejercicio del mandato constitucional impuesto por el Art. VI, Sec. 4 de nuestra Constitución que preceptúa que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de la inscripción de electores, así como lo relativo a los partidos políticos y candidaturas", determinar y reglamentar todo lo concerniente al proceso electoral, inclusive los partidos políticos y candidaturas.

La facultad concedida a la Asamblea Legislativa por el Art. VI, Sec. 4, aunque no es absoluta, es amplia y abarcadora. P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 D.P.R. 248 (1980). Sólo así puede cumplir el Estado con su obligación de proteger la pureza del proceso electoral. Es decir, la Asamblea Legislativa tiene la facultad y la obligación de aprobar aquella reglamentación que, sin obstaculizar innecesariamente el derecho al voto en todas sus dimensiones, propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro. P.S.P., P.P.D., P.I.P. v. Romero Barceló, supra; P.N.P. v. Tribunal Electoral, 104 D.P.R. 741 (1976); P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400 (1980). Bajo este poder, al reglamentar el acceso de los grupos, candidatos o fórmulas a las papeletas, el Estado se coloca en una posición que, por su naturaleza, tiene el efecto de restringir e imponer cargas sobre el derecho a participar en el proceso electoral. Véase a modo ilustrativo, Tashjian v. Republican Party of Connecticut, 479 U.S. 208 (1986).

Es dentro de este trasfondo constitucional que debemos analizar los reclamos del Partido Acción Civil.

### III

El Partido Acción Civil alega que erró el tribunal de instancia al dictar sentencia sumaria sin tomar en consideración todos los hechos materiales no controvertidos por la parte demandada y sin concederle la oportunidad de demostrar, mediante preponderancia de prueba, que las disposiciones impugnadas son inconstitucionales en su aplicación.

La Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36, regula todo lo concerniente a la sentencia sumaria. El propósito de

dicho mecanismo es aligerar la tramitación de los casos, permitiendo que se dicte sentencia sin necesidad de celebrar una vista evidenciaria, cuando de los documentos no controvertidos que se acompañan con la solicitud, y de la totalidad de los autos, surge que no existe controversia sobre los hechos materiales, por lo cual sólo corresponde aplicar el derecho. Medina v. M. S. & D. Química P.R. Inc., 135 D.P.R. 716 (1994); Cuadrado v. Santiago, 126 D.P.R. 272 (1990).

Corresponde a la parte promovente demostrar no tan sólo que no existe una controversia real sustancial sobre un hecho material, sino que como cuestión de derecho, procede dictar la sentencia a su favor. Pilot Life Ins. v. Crespo Martínez, 136 D.P.R. 624 (1994). El tribunal puede dictar sentencia sumaria a favor de la parte en el litigio que no solicitó dicho remedio si en autos constan fundamentos suficientes para ello. Audiovisual Language, etc. v. Natal Hermanos, res. el 15 de diciembre de 1997, 144 D.P.R.__ (1997).

Hemos destacado en el pasado que "[e]l hecho de que una parte presente una moción de sentencia sumaria no es garantía [de] que una vez se determine que ésta procede, necesariamente hay que resolver a favor de quien la presentó". Consejo de Titulares del Condominio Parkside, etc. v. MGIC Financial Corporation, Inc., 129 D.P.R. 538 (1991). El tribunal debe analizar los hechos de la forma más favorable a la parte que se opone a ella y emitir sentencia a favor de la parte a la cual le asiste el derecho. Colegio de Ingenieros v. A.A.A., 131 D.P.R. 735 (1992).

Según surge de los autos, el Partido Acción Civil radicó moción de sentencia sumaria en la que reiteró los argumentos esbozados en la demanda y enumeró los hechos expuestos en la demanda que alegadamente no fueron controvertidos por los codemandados. Los codemandados se opusieron a que se dictara sentencia sumaria. El tribunal de instancia, a base de los documentos y de las admisiones de las partes, enumeró una serie de hechos materiales sobre los que no existía controversia real

sustancial. Procedió entonces a examinar el derecho aplicable, y a formular las conclusiones de derecho pertinentes. Determinó, que en virtud del derecho vigente en nuestra jurisdicción, procedía declarar sin lugar la solicitud de sentencia sumaria presentada por el Partido Acción Civil y dictar sentencia desestimando sumariamente la demanda.

El Tribunal de Circuito de Apelaciones concluyó que el Tribunal de Primera Instancia actuó correctamente al hacer uso del recurso de sentencia sumaria. Al evaluar el recurso, el foro apelativo concluyó que los alegados hechos en conflicto presentados por el Partido Acción Civil en apelación para tratar de derrotar el dictamen sumario, constituyen más bien opiniones y conclusiones particulares de la parte apelante. Dichas conclusiones y opiniones, al no estar sustentadas con hechos específicos, no tienen valor probatorio y son insuficientes para demostrar la existencia de lo que allí se concluye. Por no constituir más que especulaciones no deben ser consideradas como hechos en el procedimiento de sentencia sumaria, para determinar si en realidad existe conflicto real sobre hechos materiales. Corp. Presiding Bishop CJC of LDS v. Purcell, 117 D.P.R. 714 (1986).

Por considerar, como correctamente lo determinó el tribunal apelativo, que el tribunal de instancia no estaba obligado a considerar las conclusiones y opiniones del Partido Acción Civil como hechos materiales en controversia, concluimos que el caso de autos cumple con los requisitos procesales y sustantivos requeridos para un dictamen sumario. Por ende, no abusó de su discreción el foro sentenciador al utilizar el mecanismo de sentencia sumaria en el caso de autos.

Por otro lado, el Partido Acción Civil sostiene que el tribunal de instancia incurrió en una violación a su debido proceso de ley procesal al privarle de la oportunidad de establecer en una vista evidenciaria, la alegada inconstitucionalidad de las disposiciones impugnadas en una vista evidenciaria. No le asiste la razón.

En su vertiente procesal, la cláusula de Debido Proceso de Ley le impone al Estado la obligación de garantizar que la interferencia con

los intereses de libertad y de propiedad del individuo se haga a través de un procedimiento que en esencia sea justo y equitativo. Anteriormente establecimos que el debido proceso de ley procesal no es un molde riguroso que se da en el abstracto, pues su naturaleza es eminentemente circunstancial y pragmática, no dogmática. Cada caso exige una evaluación concienzuda de las circunstancias envueltas. Quiles Rodríguez v. Superintendente de la Policía, res. el 2 de noviembre de 1995, 139 D.P.R.__ (1995); Rivera Rodríguez & Co. v. Lee Stowell Taylor, 133 D.P.R. 881 (1993); Fac. C. Soc. Aplicads, Inc. v. C.E.S., 133 D.P.R. 521 (1993).

Para que entre en vigor la protección que ofrece este derecho tiene que estar en juego un interés individual de libertad o propiedad. Una vez cumplida esta exigencia, hay que determinar cuál es el procedimiento exigido ("What process is due"). Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 274 (1987).

Para hacer dicha determinación es necesario analizar los siguientes factores: (1) los intereses individuales afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas; y (3) el interés gubernamental protegido con la acción sumaria y la posibilidad de usar métodos alternos. Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716 (1982); Matthews v. Elridge, 424 U.S. 319, (1986). Dependiendo de las circunstancias, diversas situaciones pueden requerir diferentes tipos de procedimientos, pero siempre persiste el requisito general de que el proceso gubernamental debe ser justo e imparcial.

Nuestro ordenamiento procesal civil ha considerado que no se priva a los litigantes de su derecho a un proceso justo e imparcial, cuando de cumplirse con determinados requisitos y a petición de una parte, se demuestra al tribunal que es innecesario la celebración de un juicio en su fondo. En tales supuestos, por no existir controversia sobre los hechos materiales, no hay necesidad de celebrar una vista evidenciaria

para recibir o dilucidar la prueba. Nuestro ordenamiento provee el mecanismo de las las Reglas 10.3 moción para que se dicte sentencia por las alegaciones) y 36 (sentencia sumaria) de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 10.3 y 36, para atender dichas situaciones.

En el caso ante nos, el foro de instancia consideró que por no haber una controversia real sustancial en cuanto a los hechos materiales, no se requería una vista evidenciaria, pues no había nada que dilucidar en su fondo. El propio Partido Acción Civil así lo reconoció al invocar el mecanismo de sentencia sumaria. Por no haber controversia sobre los hechos materiales, no se violó el debido proceso de ley del Partido Acción Civil al adjudicar el recurso sumariamente.

IV

El Partido Acción Civil alega que la disposición de la Ley Electoral que exige que sean abogados los que notaricen los endosos de los partidos por petición, mientras se permite que sean notarios *ad hoc* los que certifiquen los endosos de los miembros de los partidos tradicionales que aspiran a convertirse en candidatos a primarias, viola la cláusula constitucional sobre Igual Protección de las Leyes.

El Art. II, Sec. 7 de nuestra Constitución prohibe que se le niegue a persona alguna en Puerto Rico la igual protección de las leyes[3]. La garantía de la igual protección de las leyes no prohibe o impide que el Estado establezca clasificaciones para descargar adecuada y eficientemente sus funciones, ni exige que se le dé un trato igual a todas las personas, lo que prohibe es el trato desigual injustificado. San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405 (1993); Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975); P.S.P., P.P.D., P.I.P. v. Romero Barceló, supra; Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); P.R.P. v. E.L.A., 115 D.P.R. 631 (1984).

---

[3] La Sección 7 del Art. II de la Constitución de Puerto Rico establece que "[n]inguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes".

La cláusula de igual protección garantiza que, tomando en consideración el propósito y alcance de la ley, individuos que se encuentren en situaciones similares, sean tratados de modo similar por el Estado. Berberena v. Echegoyen, 128 D.P.R. 864 (1991); Rotunda and Nowak, Treatise on Constitutional Law, SS. 18.1-18.2 (1999). Antes de determinar el tipo de escrutinio a aplicarse ante una alegada violación a la cláusula de Igual Protección de las Leyes, el tribunal debe examinar, como requisito de umbral, si las personas excluidas de la clasificación están igualmente situadas que aquellas que fueron incluidas, o viceversa. Así, en Calo Morales v. Cartagena Calo, 129 D.P.R. 102 (1991), al examinar la aplicación del escrutinio estricto bajo la cláusula de Igual Protección de las Leyes, en aquellas situaciones en que la clasificación impugnada es inherentemente sospechosa, aclaramos: "Claro está, la aplicación de este análisis parte de la premisa de que la ley está brindando un trato desigual a personas similarmente situadas".[4]  Id. a la pág. 133

Al considerar si dos personas están igualmente situadas, para propósitos de la cláusula de Igual Protección de las Leyes, debemos examinar cuál es el propósito del estatuto que se impugna. Examinado el propósito del estatuto, corresponde determinar si la clasificación establecida por la Asamblea Legislativa, al incluir a unas personas y excluir a otras, es razonable. Si en el ejercicio de distinguir entre unas y otras personas, el estado aduce, en virtud del objetivo que se persigue, razones legítimas que justifican la clasificación, no se viola la garantía constitucional de Igual Protección de las Leyes. Rotunda and Nowak, supra sec. 18.2. La prohibición de esta cláusula no implica la exclusión de cualquier diferenciación entre las personas, si tal diferenciación tiene una justificación objetiva y racional. Véase a

---

[4]  Véase además R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, 1078 (1988):"La [C]onstitución debe reconocer derechos iguales a los ciudadanos cuando ellos son iguales y derechos desiguales cuando ellos son desiguales."

modo ilustrativo, <u>Katzenbach v. Morgan</u>, 384 U.S. 641, (1966); <u>Railway Express Agency, Inc. v. New York</u>, 336 U.S. 106, (1949).

V

Nos corresponde examinar cuál es el propósito que persigue la Asamblea Legislativa al establecer requisitos diferentes para la inscripción de agrupaciones políticas como partidos por petición, de los establecidos para los candidatos a primarias de partidos políticos ya inscritos. No hay duda de que ambos tipos de requisitos, aunque diferentes, en esencia persiguen salvaguardar el interés importante de proteger la integridad del proceso político de candidaturas frívolas y fraudulentas, a la vez que aseguran que el proceso electoral sea uno eficiente y libre de confusión.

Sin embargo, a diferencia del requisito de notarios *ad hoc* para juramentar las peticiones de inscripción de los candidatos a primarias, el requisito legislativo de exigir la intervención de un notario público para juramentar las peticiones de inscripción de los partidos por petición, obedece además, a la necesidad de establecer un mecanismo de inscripción que, gozando de la presunción de la fe pública notarial, garantice al máximo la pureza del proceso. <u>P.S.P.</u>, <u>P.P.D. y P.I.P</u>. v <u>Romero Barceló</u>, <u>supra</u>.

Al hacer una distinción entre los requisitos a exigirse para la inscripción de las agrupaciones políticas en proceso de inscripción como partidos por petición, de aquellos que se exigen a los candidatos a primarias de los partidos políticos ya establecidos, la Asamblea Legislativa responde a unos intereses razonables y legítimos. Las diferencias que existen entre las asociaciones políticas en proceso de inscripción y los candidatos a primarias de los partidos políticos ya establecidos, permiten y justifican que exista un trato diferente en cuanto a los requisitos de juramento de las peticiones de inscripción de cada uno. Esta dicotomía en la reglamentación tiene su razón de ser. Veamos.

La diferencia existente entre los partidos políticos y las agrupaciones políticas en vías de inscripción ha sido reiteradamente reconocida por nuestra jurisprudencia. No es hasta el momento en que la agrupación política ha satisfecho todos los requisitos exigidos por las leyes electorales para su inscripción, que se convierte en acreedora de un trato igual a los partidos tradicionales. P.R.P. v E.L.A., 115 D.P.R. 631 (1981)[5].

Esta Curia ha reconocido la preeminencia de los partidos políticos como vehículos que facilitan la organización y efectividad de la participación colectiva de los individuos. Sánchez y Colón v. E.L.A. II, 134 D.P.R. 503 (1993). En nuestro sistema democrático los partidos políticos son indispensables, están revestidos de poderes cuasi gubernamentales y constituyen el vehículo de expresión ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. P.R.P. v E.L.A., supra. Es en virtud de su carácter cuasi público, que se les otorga un subsidio a través del fondo electoral para financiar sus actividades. P.S.P. v E.L.A., 107 D.P.R. 590 (1978).

Los partidos políticos deben cumplir con rigurosas normas electorales y operan bajo un esquema diseñado para que el estado pueda supervisar y fiscalizar sus actividades políticas, administrativas y financieras. A diferencia de esto, las agrupaciones políticas que no son partidos políticos no están sujetas a este tipo de escrutinio, por lo cual no pueden ser favorecidas con una asignación de fondos públicos. P.S.P. v. E.L.A., supra.

Por su parte, el proceso de las candidaturas a primarias es uno mediante el cual los electores de los partidos políticos nominan sus candidatos a cargos públicos electivos. Art. 1.003(47) de la Ley

---

[5] En particular, la jurisprudencia federal ha establecido que, en cuanto a los requisitos de inscripción impuestos por el estado, las agrupaciones políticas que aspiran a convertirse en partidos nuevos, así como las personas que aspiran a ser candidatos independientes, no están similarmente situados que los partidos establecidos. Véase a modo ilustrativo Clements v. Flashing, 457 U.S. 957, (1982).

Electoral, 16 L.P.R.A. 3003 (47).  Es un proceso intrínsecamente propio de los partidos políticos establecidos, los cuales, por su historial, ya han demostrado un apoyo electoral.

Los aspirantes y candidatos a puestos electivos, al quedar certificados mediante los endosos, no reciben subvención alguna de fondos públicos. La certificación sólo les da derecho a aparecer en una papeleta junto a otros aspirantes, para luego someterse al escrutinio público, primero en primarias, y luego en las elecciones generales.

A diferencia de los candidatos a primarias, en los cuales el partido a que pertenecen ya ha demostrado que disfruta del apoyo del electorado, las agrupaciones políticas que interesan inscribirse como partidos, deben poder demostrar que cuentan con suficiente base electoral[6]. El Estado puede, válidamente, establecer unos requisitos para exigir una demostración preliminar de apoyo por el electorado. Estos requisitos pueden formularse como condiciones para aparecer en la papeleta electoral. Véase a modo ilustrativo, <u>Jenness v Fortson</u>, 403 U.S. 431, 442 (1971).

---

[6]  La preocupación de la Asamblea Legislativa por asegurarse de que el proceso electoral quede abierto a organizaciones políticas *bona fide* ha sido consistente. El Informe de La Comisión de Gobierno del Senado de 3 de noviembre de 1978, respecto al P. de la C. 896, antecesor de la Ley Núm. 4 de 15 de noviembre de 1978, la cual enmendó el Artículo 3.001 de la Ley Electoral para añadir el requisito de que las peticiones de inscripción de los partidos por petición fuesen juramentadas ante notario público, así lo refleja:

"Un partido político que pudo inscribirse como partido por petición para participar en las elecciones generales de 1976, no necesita de la estricta garantía de que sus peticiones de inscripción para participar en las elecciones generales de 1980 sean juramentadas ante Notario Público, bastando, para que se cumpla efectivamente el propósito de la ley, con que sus peticiones sean juramentadas ante electores autorizadas [sic] por la Comisión Estatal de Elecciones para esos fines. El esfuerzo que conlleva el inscribir nuevamente un partido político en el periodo posterior a unas elecciones generales en las que dicho partido perdió su personalidad jurídica como tal, es hecho demostrativo de que se trata de una agrupación política bona fide.

No obstante entendemos que debe mantenerse el requisito de que las peticiones sean juramentadas ante notarios públicos en el caso de los partidos que por primera vez se encuentran en proceso de inscripción, salvaguardándose así la pureza del procedimiento, y

El interés del Estado de cerciorarse de que se trate de una agrupación política *bona fide* que cuenta con un respaldo del electorado, es todavía más apremiante si consideramos que una vez logran su inscripción como partido, las agrupaciones políticas participan del Fondo Electoral, tienen derecho a un Comisionado Electoral y a tener representantes a tiempo completo en las Juntas de Inscripción Permanente a cargo del erario público. Ante esta realidad se justifica que el Estado establezca un proceso de evaluación y certificación más estricto.

Un examen del Informe sometido por la Comisión de Gobierno de la Cámara de Representantes sobre el P. de la C. 896, antecesor de la Ley Núm. 4 de 15 de noviembre de 1978, la cual enmendó el Art. 3.001 de la Ley Electoral y añadió el requisito de que las peticiones de inscripción de los partidos por petición fuesen juramentadas ante un notario público, demuestra la preocupación de la Asamblea Legislativa respecto a la participación en el Fondo Electoral:

> "Un factor de gran importancia que debe considerarse al aprobar este Proyecto, lo es la disposición de la Ley Electoral vigente en lo referente al Fondo Electoral. Siendo dicho fondo parte del erario público, hay que salvaguardar que la participación del mismo no le sea entregada a partidos por petición que se hayan inscrito fraudulentamente, y por el contrario, participe de él aquel partido que tenga el endoso de un sector verdaderamente interesado y el cual inscribió legalmente un nuevo partido." Informe de la Comisión de Gobierno de la Cámara de 24 de octubre de 1978.

Ante lo anteriormente expuesto, concluimos que las agrupaciones políticas que aspiran a convertirse en partidos por petición no están igualmente situadas que los candidatos a primarias de los partidos políticos establecidos. Existe una justificación legítima y objetiva para que el Estado establezca unos requisitos más rigurosos para las peticiones de inscripción de las agrupaciones políticas que aspiran a convertirse en partidos por petición, que los requisitos establecidos para los candidatos a primarias.

---

garantizándose que dichos partidos son agrupaciones políticas bona fide."

La Asamblea Legislativa tiene un interés legítimo al exigir una demostración *prima facie* de apoyo electoral a las agrupaciones políticas que radican peticiones de inscripción, y al establecer un mecanismo para garantizar la confiabilidad de dichas peticiones. En nuestro ordenamiento, ese mecanismo es el juramento de dichas peticiones ante un notario público, y la fe pública que la intervención de tal funcionario otorga.

El Partido Acción Civil alega además, que durante la celebración del plebiscito del 13 de diciembre de 1998, se permitió a Pro E.L.A. juramentar los endosos requeridos para tener acceso a la papeleta plebiscitaria y hacer campaña con fondos públicos como representante de la libre asociación, ante los funcionarios autorizados por ley para tomar juramentos y por notarios *ad hoc* que fueron autorizados por la C.E.E.

Sobre esta alegación basta con señalar que los requisitos para representación oficial de las opciones plebiscitarias, que fueron los requisitos satisfechos por Pro E.L.A., fueron establecidos mediante ley especial, Art. 10 de la Ley Núm. 249 de 17 de agosto de 1998, conocida como la Ley del Plebiscito de 1998[7]. El propósito de dicha ley fue viabilizar un proceso eleccionario que atendiera la controversia sobre la condición política de los habitantes de Puerto Rico con relación a los Estados Unidos. Art. 1 de la Ley del Plebiscito de 1998. Fue en atención a la naturaleza especial del proceso plebiscitario que la Asamblea Legislativa pautó los requisitos a cumplirse.

En el proceso eleccionario ordinario los partidos que han logrado acceso a la papeleta presentan al electorado sus candidatos para regir el destino de Puerto Rico. Dichos candidatos, de resultar electos, formarán parte de nuestro gobierno por los próximos cuatro años. El

---

[7] El Art. 6 de la Ley del Plebiscito estableció que las disposiciones de la Ley Electoral serían aplicables al proceso plebiscitario en todo aquello para lo cual la ley especial del plebiscito no hubiese dispuesto un régimen distinto. Esto es congruente con el Art. 7.0001 de la Ley Electoral, 31 L.P.R.A. sec. 3301, que dispone que las

Estado tiene un interés legítimo en que dichos candidatos sean unos que auténticamente representen los intereses del sector de la población que depositó en ellos su confianza. Para ello es necesario establecer unos requisitos estrictos que garanticen que el proceso ha sido uno libre de fraude y corrupción. Configuraría una situación grave el que luego de haber resultado electos ciertos candidatos, y de haber juramentado su puesto, se descubriese que el partido que los auspició había sido inscrito fraudulentamente.

A diferencia de esto, el proceso plebiscitario, no es uno para elegir candidatos, ni para establecer el gobierno de Puerto Rico. Por su naturaleza lo que persigue es dar un acceso a las diversas ideologías existentes sobre cuál debe ser el futuro político de Puerto Rico.

Debemos señalar que la Ley del Plebiscito de 1998, al igual que la Ley Electoral, dio un trato diferente a las agrupaciones que solicitaron representar una de las opciones de status, que aquél dado a los partidos políticos establecidos. El Art. 10 de la Ley del Plebiscito de 1998 disponía que la participación oficial de los partidos políticos establecidos quedaba asegurada con la mera notificación escrita a la C.E.E. dentro del término pautado en ley, por parte de sus organismos directivos.

Por su parte, la oportunidad de participación de las otras agrupaciones políticas, se reglamentó específicamente. En primer lugar, se dispuso que las organizaciones políticas podrían solicitar que se les certificase para representar oficialmente una opción, siempre y cuando dicha opción no estuviese ya representada por un partido político. Además, para obtener tal certificación, la agrupación debía de acreditar ante la C.E.E. que tenía personalidad jurídica al momento de aprobarse la Ley del Plebiscito, y un público y reconocido historial de defensa de la opción que pretendía representar; someter ante la

---

celebraciones de referéndum o plebiscito se regirán por la ley especial que para dicho propósito se apruebe.

C.E.E. un número de peticiones de endosos equivalentes a no menos del tres porciento (3%) de los electores que votaron en el Plebiscito de 1993 por la opción de status que menos votos obtuvo en dicha consulta; dichas peticiones podían ser juramentadas por los funcionarios autorizados por ley para tomar juramentos y por aquellos que la C.E.E. así autorizara. Ley Núm. 249 de 17 de agosto de 1998, Art. 10(3).

Es decir, la Asamblea Legislativa optó por exigir a las agrupaciones que interesaban participar en el plebiscito de 1998 en representación de una de las opciones que no estuviese representada por un partido político, unos requisitos distintos a los exigidos a los partidos políticos establecidos, y a los que se exigen para la inscripción de partidos por petición para las elecciones generales.

El argumento del Partido Acción Civil descansa en el hecho de que Pro ELA, como agrupación política que representaba la opción de libre asociación fue certificada para concurrir al plebiscito a través de juramentos con notarios *ad hoc*, y a su vez participó de los fondos especiales asignados para el plebiscito. Respecto a este argumento debemos señalar las diferencias entre la participación de una agrupación política debidamente cualificada para defender una opción de status en los fondos plebiscitarios y la participación de los partidos inscritos, ya sean los principales o por petición, en el Fondo Electoral.

El Fondo Electoral es un fondo de carácter permanente que garantiza a todos los partidos políticos, los principales y los por petición, una participación para cada uno de $300,000.00 anuales en años no eleccionarios, y de $600,000.00 en años eleccionarios. Ley Electoral, Art. 3.023, 16 L.P.R.A. sec. 3116. Los fondos especiales asignados a los partidos y agrupaciones cualificadas que participaron en el plebiscito de 1998 consistieron de una asignación única y a corto plazo de $2,000,000.00 a ser distribuida por partes iguales entre todos los partidos políticos y las agrupaciones políticas cualificadas. Art. 30 de la Ley del Plebiscito de 1998, supra.

Por lo anteriormente expuesto respecto a la naturaleza del proceso plebiscitario y al carácter de los fondos públicos asignados para dicho proceso, concluimos que las agrupaciones políticas que aspiran a convertirse en partidos por petición no están igualmente situadas que las agrupaciones políticas que participan en un proceso plebiscitario. Existe una justificación legítima y objetiva para que el Estado establezca unos requisitos más rigurosos para las peticiones de inscripción de las agrupaciones políticas que aspiran a convertirse en partidos por petición. Una vez reconocidas como partidos por petición, dichas agrupaciones, tienen derecho a presentar candidatos a puestos electivos en las elecciones generales, y a una participación anual sustancial del Fondo Electoral.

VI

Por último, nos compete examinar la alegación del Partido Acción Civil de que las disposiciones impugnadas violan los derechos de asociación, expresión y al voto efectivo bajo la doctrina de acceso a la papeleta electoral, y de que la legislación afecta su derecho a ser candidato a un puesto público.

En primer lugar, debemos señalar que aunque los derechos al voto y a asociación son de carácter fundamental, y su ejercicio conlleva el derecho a votar de una manera determinada, tanto el derecho a ser candidato a un cargo electivo, así como el comparecer como asociación en la papeleta electoral, no son derechos fundamentales. García v. Luciano, 115 D.P.R. 628, (1984), P.P.D. v. Planadeball Poggy, 121 D.P.R. 570 (1988). Véanse además a modo ilustrativo, Clements v. Flashing, 457 U.S. 957, 963 (1982), Munro v. Socialist Workers Party, 479 U.S. 189 (1986); Burdick v. Takushi, 504 U.S.___, 119 L.Ed.2d 245 (1992).

Ante el interés estatal de evitar el caos y la confusión electoral, los estados tienen la facultad de reglamentar los requisitos necesarios para tener acceso a la papeleta electoral. Sin embargo, tal

poder no es absoluto. Los mecanismos de reglamentación utilizados por el estado no pueden tener el propósito de excluir a ciertas clases de candidatos y partidos del proceso eleccionario. Es decir, las disposiciones sobre acceso a la papeleta electoral no pueden restringir de modo innecesario o discriminatorio las oportunidades de un candidato o de una agrupación política a tener acceso al electorado, ni pueden operar para excluir ciertos tipos de candidatos o partidos del proceso electoral. Véase a modo ilustrativo, Lubin v. Panish, 415 U.S. 709, 716 (1974).

En Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445, 450 (1993), examinamos el delicado balance entre el derecho fundamental al sufragio y el interés del Estado en reglamentar su ejercicio, y llegamos a la conclusión que el proceso de análisis es el de estudiar las circunstancias particulares de cada caso. No existe un criterio rígido e invariable que deba ser utilizado en este tipo de análisis judicial.

La jurisprudencia federal relacionada a la doctrina de acceso a la papeleta ha elaborado el escrutinio a aplicarse cuando se alega que alguna disposición del Estado restringe a un candidato, o a una asociación, el acceso a la papeleta electoral. Dicha jurisprudencia fue objeto de análisis en Sánchez y Colón v. E.L.A. II, 134 D.P.R. 503 (1993)(Opinión de Conformidad del Juez Presidente señor Andréu García).

En aquellos casos en que se impugna la constitucionalidad de una ley que reglamenta el acceso a la papeleta electoral, no se impone automáticamente a los tribunales el deber de aplicar un escrutinio estricto. El someter automáticamente cada disposición electoral al escrutinio estricto le ataría las manos a los estados en su interés de reglamentar para garantizar que las elecciones se lleven a cabo de forma equitativa y eficiente. Véanse a modo ilustrativo Bullock v. Carter, 405 U.S. 134 (1972); Anderson v. Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, supra.

Ante un reclamo de inconstitucionalidad al amparo de la doctrina de acceso a la papeleta, corresponde al Tribunal, en primer lugar,

determinar si la restricción es severa, irrazonable o discriminatoria, y examinar la naturaleza y magnitud del daño alegado y la dimensión del perjuicio ocasionado.  Si se determina que la restricción es severa, irrazonable o discriminatoria, se sujeta la reglamentación al escrutinio estricto.

Al amparo de la doctrina de acceso a la papeleta se entiende que es severa aquella restricción que tiene el efecto de hacer imposible que todo nuevo candidato o asociación política pueda tener acceso a la papeleta electoral. La pregunta que debe contestarse es si un candidato que ejerce una diligencia razonable, puede satisfacer los requisitos impuestos por el Estado.[8]  Véanse a modo ilustrativo Storer v. Brown, 415 U.S. 724 (1974); Jennes v. Fortson, supra; Norman v. Reed, 502 U.S.__, 116 L.Ed.2d 711 (1992).

En aquellos casos en que la restricción impuesta por el estatuto es razonable y no discriminatoria, se aplica el estándar de balance de intereses. En este proceso se evalúan los intereses gubernamentales que justifican la imposición de la restricciones impugnadas, y se sopesan frente a la naturaleza y magnitud de los daños alegados por los demandantes a sus derechos al voto y libre asociación.  Luego se procede a determinar si los intereses gubernamentales aducidos por el estado para adoptar la reglamentación son legítimos, y si la importancia de esos intereses justifica la imposición de la reglamentación impugnada. Dentro de este análisis, un interés importante del Estado sería suficiente para sostener la validez constitucional de la reglamentación. Sánchez y Colón v. E.L.A. II, supra; Anderson v. Celebrezze, supra; Burdick v. Takushi, supra.

Nos corresponde pues, identificar y evaluar cuál es la naturaleza y magnitud de los daños alegados por el Partido Acción Civil, y

---

[8]  Las cortes federales inferiores, al analizar la onerosidad de las restricciones impuestas utilizan lo que se conoce como el enfoque total ("totality approach"). Esto conlleva considerar la carga impuesta por la disposición impugnada pero teniendo en cuenta la totalidad del esquema electoral estatal. McLaughlin v. North Carolina Bd. Of

determinar si las restricciones impuestas por los artículos de la Ley Electoral impugnados son irrazonables o discriminatorias. De determinar que dichas restricciones son razonables y no discriminatorias, debemos evaluar los intereses gubernamentales que justifican la imposición de la reglamentación, pesándolos frente a los daños al derecho al voto y a la libre asociación alegados por el Partido Acción Civil.

El Partido Acción Civil alega que ambas disposiciones impugnadas son extremadamente onerosas, irrazonables y discriminatorias e imposibles de cumplir, y que responden a una oligarquía de partidocracia. Alega que debido a dichas disposiciones, se le hará imposible cumplir, en el término requerido, con el número de endosos que debe presentar ante la C.E.E. para lograr su inscripción como un partido por petición.

Alega, además, que el requisito de juramento ante notario le pone trabas innecesarias a su derecho de acceso a la papeleta electoral y supedita la creación de los partidos políticos a la clase de abogados. Aduce que el requisito de juramento ante notario limita el número de endosos que pueden recolectar, dada el número limitado del total de abogados en nuestra jurisdicción. Expone que ningún abogado está dispuesto a salir de su oficina para recolectar endosos, porque lo que recibe por cada endoso es un $1.00 lo cual le representa una pérdida.[9] Aduce también que dicho requisito le impone hacer primero una campaña para reclutar notarios para luego reclutar electores, lo cual le resulta muy costoso.

Respecto al requisito de tener que someter los endosos juramentados a la C.E.E. dentro de un término de siete días, el Partido Acción Civil alega que es un término oneroso e irrazonable por ser un término demasiado corto para hacer los informes requeridos, sacar

Elections, 65 F.3d 1215 (4th Cir. 1995); Schulz v. Williams, 44 F. 3d 48 (2d Cir. 1994).

[9] Los notarios reciben de la C.E.E. un dólar por cada petición notarizada válida, como honorarios por su gestión. Art. 3.0001(3) de la Ley Electoral, 16 L.P.R.A. sec. 1301(3).

copias, confrontar el endoso con las listas electorales y llevarlos a la C.E.E.

No hay duda que las alegaciones del Partido Acción Civil demuestran que las disposiciones impugnadas hacen más difícil el que una agrupación política que desea tener acceso a la papeleta elctoral logre ser reconocida como partido por petición. Sin embargo, no podemos coincidir con su alegación de que los requisitos impuestos hacen imposible que una agrupación política logre su inscripción.

En Puerto Rico, al día de ayer[10], existen 6,735 notarios públicos distribuidos a través de toda la isla. Además, la historia nos demuestra que en 1984, teniendo que cumplir con los mismos requisitos ahora impugnados por el Partido Acción Civil, el Partido Renovación Puertorriqueña logró su inscripción.

Un análisis de las disposiciones impugnadas demuestran, en primer lugar, que dichas disposiciones impugnadas no son discriminatorias. Las mismas aplican por igual a toda aquella agrupación política que aspire a concurrir en la papeleta electoral como partido por petición, independientemente de su ideología política o social.

En cuanto a la razonabilidad de las restricciones, debemos examinar cuáles son los intereses que el Estado quiere adelantar a través de su imposición, si dichos intereses son legítimos y si su importancia justifica la imposición de la reglamentación impugnada. Analicemos cada restricción independientemente:

A. El requisito de que las peticiones de inscripción sean juramentadas ante notario:

La Ley Núm. 4 de 15 de noviembre de 1978, enmendó el Artículo 3.001 de la Ley Electoral, y añadió el requisito de que las peticiones de inscripción de los partidos por petición fuesen juramentadas ante un notario público. La razón de dicha enmienda quedó plasmada en el Informe de la Comisión de Gobierno del Senado de P.R. respecto al P. de la C. 896:

---

[10]   24 de febrero de 2000.

Por inadvertencia, al considerarse y aprobarse la vigente Ley Electoral, no se incluyó el requisito de que las peticiones para inscribir partidos por petición fuesen juradas y ahora se pretende corregir dicha omisión, adicionando la palabra jurada en los casos en que se hace referencia a las peticiones de inscripción. Con ello subsanamos una laguna existente, siguiendo la tradición en los procesos de inscripción de los partidos por petición.

.........................................

**El requisito de juramentación [sic] de las peticiones de inscripción de los partidos por petición establece una garantía de la veracidad de la intención del elector expresada en la petición, y se protege la pureza en el procedimiento de inscripción de partidos. Ello permite, además, que pueda sancionarse cualquier acto ilegal por parte de la persona que toma el juramento.** In Re Jorge Luis Landín y José Aulet. Opinión de 13 de abril de 1978.

Nuestra historia política está llena de ejemplo[sic] con relación a partidos que, o no lograron inscribirse, o que de haberlo hecho, no mantuvieron su status por mucho tiempo, demostrándose así que carecían de la solidez y trascendencia deseables en un sistema democrático sólido y estable, como lo es el de Puerto Rico... Informe de la Comisión de Gobierno del Senado del 3 de noviembre de 1978.

Por su parte, el Informe de la Comisión de Gobierno de la Cámara de Representantes resumió el interés del Estado al exigir la intervención de los notarios:

**La solicitud de un juramento en las peticiones de inscripción de un partido por petición establece una fe pública de la veracidad de la intención del elector de crear un nuevo Partido que representará el interés político de un sector del Pueblo de Puerto Rico, y garantiza la pureza del procedimiento.** Informe de la Comisión de Gobierno de la Cámara de Representantes sobre el P. de la C. 896, 24 de octubre de 1978.

En Puerto Rico, los notarios son los funcionarios encargados de garantizar la autenticidad de las firmas hechas ante sí, mediante la fe pública notarial. Art. 2 de la Ley Notarial, 4 L.P.R.A. sec. 2002. La intervención del notario otorga una presunción de veracidad a los documentos en que interviene. Al exigir la intervención de un notario, la Asamblea Legislativa optó por garantizar la confiabilidad de las peticiones mediante la participación de los únicos funcionarios investidos por el Tribunal Supremo para garantizar con el ministerio de la fe pública aquellos documentos que juramenten. In re: Notaría de la Lic. Lynette Algarín Otero, 117 D.P.R. 365 (1986).

Los notarios, como únicos funcionarios capacitados para la dación de fe notarial, tienen la obligación de cumplir estrictamente con lo preceptuado en la Ley Notarial.  Deben ser exigentes y abstenerse de dar fe si la persona que va a otorgar la declaración jurada no ha comparecido personalmente, o si los hechos que se suscriben son inconsistentes con la verdad.  In re Sánchez Ruiz, 105 D.P.R. 848 (1977); In re: Fred H. Martínez, res. el 12 de abril de 1999, 99 TSPR 53.

La práctica notarial está rigurosamente reglamentada en nuestra jurisdicción.  Los testimonios o declaraciones de autenticidad bajo la fe pública están reglamentados por los Artículos 56 a 60 de la Ley Notarial, 4 L.P.R.A. sec. 2091 y sigs, y por las Reglas 64 a 73 del Reglamento Notarial, 4 L.P.R.A. Ap. XXIV R. 64 a 73.  La ley y el Reglamento requieren que se registren en el Registro de Testimonios y que se informen en el Indice Mensual que debe rendir todo notario.  El notario tiene la obligación de hacer constar tanto en el testamento como en el Registro de Testimonios, su conocimiento personal del firmante o, en su defecto, la utilización de los medios supletorios del Art. 17 de la Ley Notarial.  El Registro de Testimonios es revisado por los Inspectores de Protocolo para asegurar que el notario ha cumplido rigurosamente con lo dispuesto por la ley.

Por su parte, además de las disposiciones de la Ley Notarial, el Canon 35 de Etica Profesional, 4 L.P.R.A. Ap. IX C. 35, impone a los abogados la obligación de "ajustarse a la sinceridad de los hechos [ ... ] al redactar afidávit u otros documentos". In re: Rivero Arvelo y Ortiz Velázquez, 132 D.P.R. 849 (1993); In re: Chaar Cacho, 123 D.P.R. 655 (1989).  De incumplir con las disposiciones de la Ley Notarial o de los Cánones de Etica Profesional, el notario se expone a severas sanciones disciplinarias.

Es un hecho incontrovertido que el Estado no cuenta con suficientes funcionarios para fiscalizar la legitimidad del proceso de los endosos para nuevos partidos. La Asamblea Legislativa ha requerido

la intervención de los notarios, únicos funcionarios autorizados para actuar a base del ministerio de la fe pública, como un cedazo inicial que otorgue una presunción de veracidad a los endosos así obtenidos.

La intervención del notario responde además al interés apremiante del estado de garantizar la pureza del proceso electoral, dado el historial de fraude y corrupción electoral vivido en Puerto Rico.  La práctica popularmente conocida como vaciado de listas, documentada en nuestra historia política durante la inscripción del Partido Acción Cristiana en la década de los sesenta, justifica el requisito de juramento ante notario.  In re: Jorge Luis Landín y José Aulet, 107 D.P.R. 103 (1978);, In re: María Luisa Ramos, 86 D.P.R. 125 (1962 ); P.S.P. v. Romero, 110 D.P.R. 248 (1980).[11]

Tomando en consideración que las peticiones de endoso son el instrumento a través del cual, una vez obtenido el número requerido por ley, una agrupación política queda inscrita como partido, con todas las prerrogativas que la ley reconoce, como lo es la participación en el Fondo Electoral, y que el notario es el único funcionario investido con la fe pública, es forzoso concluir que el requisito de la intervención de un notario en el juramento de dichos endosos, es, a la luz de nuestro historial de fraude y corrupción electoral, un requisito razonable y legítimo.

Concluimos también que los intereses del estado de garantizar la integridad del proceso electoral, de garantizar que las firmas en los endosos de inscripción sean confiables y de exigir que las agrupaciones políticas que pretenden tener acceso a la papeleta electoral demuestren tener el apoyo del electorado, son intereses legítimos y de primordial

---

[11] A través de nuestra historia electoral, los estatutos penales contra el fraude electoral han sido inefectivos como medida de prevención contra el fraude. P.S.P. v. Romero, 110 D.P.R. 248 (1980).

importancia. No albergamos duda de que la importancia de dichos intereses justifica la imposición de la disposición impugnada.[12]

B. El requisito de que las peticiones de inscripción sean presentadas ante la C.E.E. dentro de siete días de su juramento:

El Partido Acción Civil aduce que se le hace imposible presentar ante la C.E.E. la petición original y dos copias de cada endoso, así como preparar los informes de las peticiones a presentarse, con sus respectivas copias dentro del término de siete días. No nos persuaden sus argumentos.

El Código Electoral de 1974, según enmendado, predecesor de nuestra actual Ley Electoral establecía que el término de radicación de las peticiones de inscripción sería de 72 horas, con la posibilidad de que se concediera una prórroga de 48 horas, de ameritarlo las circunstancias. La Asamblea Legislativa enmendó dicha disposición para extender el término a siete días. Consideramos que el término de siete días concedido por el Art. 3.002 es razonable, es posible su cumplimiento, y responde a un interés legítimo del Estado.

El requisito de que las peticiones de inscripción juramentadas sean presentadas ante la C.E.E. dentro de siete días de su otorgamiento responde al interés del Estado de evitar la acumulación de múltiples peticiones de inscripción cerca de la fecha límite para inscribir los partidos. Además, ofrece la oportunidad de que la C.E.E. pueda notificar a la agrupación en proceso de inscripción, el número de inscripciones validadas, con tiempo suficiente para que pueda subsanar los defectos de las rechazadas. Dichos intereses son legítimos y razonables.

Para garantizar un examen adecuado de los endosos sometidos, dentro de los limitados recursos que tiene la C.E.E., es necesario un mecanismo que permita un examen gradual de las peticiones, para determinar si las mismas han sido debidamente perfeccionadas. La

---

[12] El requisito de que las papeletas de inscripción de un partido sean notarizadas fue validado en la jurisdicción federal en American Party of Texas v. White, 94 S. Ct. 1296 (1976).

Asamblea Legislativa escogió el término de siete días, lo cual no es irrazonable, ni excesivamente oneroso.

Ante las alegaciones el Partido Acción Civil de que tiene que someter 97,784 peticiones, se justifica ampliamente el requisito de los siete días como un mecanismo para lograr que la C.E.E. puede examinar, en periodos graduales y sucesivos, la validez de los endosos sometidos.[13]


VII

Nos corresponde antes de concluir, hacer unos últimos señalamientos.

Si bien es cierto que el proceso de inscripción de una agrupación política no debe estar rodeado de condiciones y requisitos tales que en la práctica se impida la organización legal de un partido político, frustrándose así la expresión de un núcleo de la ciudadanía, y con ello atentándose contra la esencia misma de la democracia, Partido Popular v. Gallardo, 56 D.P.R. 706 (1940), no debemos olvidar que en el ejercicio de su facultad constitucional para regular el proceso eleccionario, la Asamblea Legislativa tiene la facultad de establecer requisitos razonables y no discriminatorios para la inscripción de nuevos partidos. Independienemente de nuestra posición personal sobre las ventajas o desventajas que para nuestro ordenamiento democrático supone la concurrencia de una multiplicidad de partidos a la papeleta electoral, nuestra función en este caso se limita a determinar si las disposiciones impugnadas son inconstitucionales.

En el ejercicio de su facultad para regular el proceso eleccionario, la Asamblea Legislativa, ha ido, a través de los años, enmendando la Ley Electoral y liberalizando los requisitos de

---

[13] Un requisito similar fue validado en Matthews v Morris, 515 F. Supp. 935, 649 F. 2d 280 (4 Cir.1981).

inscripción de nuevos partidos y candidatos independientes[14]. Como parte de la reforma electoral de 1983 se enmendó el Art. 3.001 de la Ley Electoral, 16 LPRA 3101, para eliminar el requisito de dispersión.[15]

Surge de un examen del esquema electoral vigente en nuestra jurisdicción que en Puerto Rico, un nuevo partido político puede constituirse durante cualquier momento. El periodo de inscripción para nuevos partidos abarca todo el año natural, excepto el periodo de junio a noviembre de los años de elección general. Entre las disposiciones vigentes que regulan las inscripciones de nuevos partidos, hay algunas especialmente diseñadas para facilitar la inscripción de nuevas agrupaciones políticas: se exime del sello de $3.00 de asistencia legal en los juramentos de peticiones de inscripción, Art. 1 de la Ley 126 de 12 de agosto de 1996, 16 L.P.R.A. 3028; y además, la C.E.E. paga a la agrupación promotora $1.00 por cada petición notarizada válida como honorarios de abogado. Art. 3.0001(3) de la Ley Electoral, 16 L.P.R.A. sec. 1301(3). Dentro de nuestro esquema electoral existen también otras alternativas, además de los partidos por petición, para tener acceso a la papeleta electoral: la candidatura independiente y el voto directo. Art. 4.027 de la Ley Electoral, 16 L.P.R.A. 3177, y Art. 5.11 de la Ley Electoral, 16 L.P.R.A. sec. 3211.

---

[14] Tomamos conocimiento judicial de la presentación del P. de la C. 2438 de 24 de marzo de 1999, para enmendar los Art. 3.001(3) y 3.002 de la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, conocida como la Ley Electoral, para establecer que los partidos por petición puedan radicar ante la C.E.E. peticiones juradas, además de ante notarios públicos, ante cualquier funcionario o empleado de la C.E.E. autorizado por ésta para llevar a cabo esa función y para extender el término para someter dichas peticiones ante la C.E.E. de 7 a 15 días.

En relación a dicho proyecto, el Informe de la Comisión de Gobierno de la Cámara, recomendó aumentar el pago a los notarios de $1.00 a $2.00, bajar la cantidad de peticiones de inscripción a un 4%, extender el término de 7 a 15 días, y que las peticiones puedan ser juramentadas tanto ante notarios públicos, como por funcionarios y empleados de las Juntas de Inscripción Permanente, autorizados por la C.E.E. para llevar a cabo esa función.

[15] Hasta 1983, para inscribir un partido por petición, se requería la presentación de peticiones juradas en un número no menor de 5% del total de votos para el cargo de gobernador en la elección precedente y que ese 5% se distribuyera geográficamente entre, por lo menos, la mitad más uno de los precintos electorales.

Examinadas las disposiciones impugnadas por el Partido Acción Civil, concluimos que las mismas no violan la doctrina de acceso a la papeleta electoral. Dichas disposiciones no son discriminatorias, ya que imponen los mismos requisitos a toda asociación política que aspira a convertirse en un partido por petición, independientemente de la ideología o ideales que sustente. Las disposiciones impugnadas, aunque imponen una carga al Partido Acción Civil, la misma no es tan severa como para imposibilitar que una agrupación política que demuestre un grado de diligencia razonable logre acceso a la papeleta electoral.

Respecto a las alegaciones de que el Partido Acción Civil ha recibido un trato desigual respecto a los candidatos a primarias de los partidos tradicionales, y a las agrupaciones políticas en el proceso plebiscitario, concluimos que las agrupaciones políticas que aspiran a inscribirse como partidos por petición para participar en las elecciones generales, no están igualmente situadas que los candidatos a primarias de los partidos políticos y las agrupaciones políticas que concurrieron al pasado plebiscito.

Las disposiciones impugnadas constituyen un ejercicio razonable de la discreción del poder legislativo para adelantar intereses legítimos y de singular importancia. El objetivo de garantizar un proceso electoral justo y libre de fraude justifica la imposición de dichos requisitos al Partido Acción Civil.

Corresponde a la Asamblea Legislativa, y no a este Tribunal, modificar, de estimarlo necesario, los requisitos para inscripción de un partido por petición. Dicha facultad es de rango constitucional, Const. de P.R., Art. VI, Sec. 4, y como tal merece nuestra mayor deferencia.

Se dictará la Sentencia correspondiente.

Federico Hernández Denton
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Acción Civil

  Peticionario

    v.                                    AC-1999-20      Certiorari

Estado Libre Asociado
de Puerto Rico, et al

  Recurridos

SENTENCIA

San Juan, Puerto Rico, a 25 de febrero de 2000.

Por los fundamentos expresados en la Opinión que antecede, los cuales se hacen formar parte integral de la presente, se confirma la Sentencia del Tribunal de Circuito de Apelaciones que sostuvo la constitucionalidad de los Arts. 3.001(3) y 3.002 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada. 16 L.P.R.A. 3103(3) y 3102.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió Opinión Disidente. La Juez Asociada señora Naveira de Rodón y el Juez Asociado señor Fuster Berlingeri disienten sin opinión escrita.

                                Isabel Llompart Zeno
                      Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Partido de Acción Civil

    Peticionario

       v.

                     AC-1999-20

Estado Libre Asociado de
Puerto Rico

    Recurridos


Opinión Disidente del Juez Asociado señor Negrón García


San Juan, Puerto Rico, a 25 de febrero de 2000

"**Nadie sostendría que se deben poner obstáculos indebidos en el camino de un movimiento político nuevo y responsable que desee incluir sus candidatos en la papeleta electoral para que el público los evalúe. Por otro lado, ningún observador político serio defendería el derecho de los 'partidos' frívolos y oportunistas a confundir la papeleta y el electorado. El problema es determinar si el miedo de los que se oponen [a los partidos nuevos], porque esto amenazaría la agradable 'estabilidad' del actual sistema, está justificado'**". M. Pabón, <u>Los Derechos      y      los      Partidos</u>

Políticos en la Sociedad Puertorriqueña, Ed. Edil, San Juan, 1968, pág. 110.

I

La subordinación del orden político a los derechos del hombre y el asegurar la libre participación del ciudadano en las decisiones colectivas -Preámbulo, Constitución E.L.A.-, se torna ilusoria cuando se imponen obstáculos onerosos al acceso individual a las urnas, al derecho de asociación y a formar agrupaciones y candidatos. Ortiz v. Barreto, 110 D.P.R. 84 (1980); P.S.P. v. C.E.E., 110 D.P.R. 400 (1980); García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976).

La incuestionable facultad de la Asamblea Legislativa para reglamentar estos derechos no es absoluta: **la igualdad en el trato es requisito sine qua non para validar el proceso mismo.** Giménez v. J.E.E., 96 D.P.R. 943 (1968); P.R.P. v. E.L.A., 115 D.P.R. 631, 638 (1984). Si de su faz o en la práctica, la legislación es irrazonablemente onerosa e inhibe sustancialmente la génesis de nuevos partidos, o crea situaciones de inferioridad, los tribunales bajo el **escrutinio judicial estricto** tienen el deber de reivindicar el **derecho al voto, asociación, e igualdad electoral**. Si se inmola el principio igualitario que debe regir en cualquier proceso electoral **manteniendo o introduciendo** reglas distintas y más onerosas -disminuyendo así el potencial real del ciudadano a organizarse para colectivamente participar en el proceso político (sin que el Estado pueda oponer y demostrar interés apremiante)- nuestra responsabilidad judicial es descartarla en abono de los **derechos constitucionales fundamentales** envueltos.

La meta del **P.A.C.** de figurar en la papeleta electoral como opción político partidista en las próximas elecciones queda frustrada con la respetable opinión mayoritaria.

II

El requisito de **exclusiva juramentación de peticiones de endoso ante notario público** establecido por el Art. 3.001(3) de la Ley

Electoral,[16] Ley Núm. 4 de 15 de noviembre de 1978, se justificó a base de la percepción de la Asamblea Legislativa de "cumplir **con una tradición** en nuestro proceso de inscripción de partidos por petición". (Informe Cámara de Representantes, 24 de octubre de 1978).

La historia de la Ley Electoral original desde el año

---

[16] Reza:

"Se considerará como 'Partido por Petición' a cualquier agrupación de ciudadanos que, con el propósito de figurar en la papeleta electoral de unas elecciones generales, en o antes del primero de junio del año de elecciones se inscriba como partido político, mediante la radicación ante la Comisión de peticiones juradas al efecto, **ante notarios públicos admitidos al ejercicio de la notaria**,..., quienes percibirán de la Comisión Electoral un (1) dólar por cada petición notarizada válida como honorarios, suscritas por un número de electores no menor del cinco (5) por ciento del total de votos depositados para todos los candidatos al cargo de Gobernador en la elección precedente...."

1919 hasta el Código Electoral de 1974 y la Ley Electoral de 1977, no avala la conclusión legislativa y existencia de esa "tradición". El requisito de **"exclusividad notarial"** fue establecido en el **1978**. En el entorno electoral puertorriqueño la realidad legal siempre había sido más amplia: jurar ante cualquier funcionario autorizado por ley y jueces; incluso en la década de 1960 se añadió a los Presidentes de las Juntas Locales de Elecciones.

La imposición legislativa actual de que **sólo ante notarios** puedan juramentarse las inscripciones, es una clara restricción frente al fácil acceso a esos otros recursos humanos de funcionarios idóneos, disponibles a través de la isla por tarea completa en oficinas públicas.

Reclutar únicamente abogados notarios para que, por la módica suma de $1.00 por petición, echen a un lado la práctica de la abogacía y concentren sus labores en este tipo de actividad inscripcionaria es oneroso. Recordamos también la responsabilidad que conlleva radicar en la Secretaría de la Comisión Estatal informes notariales cada quince (15) días –conteniendo una relación de las peticiones de inscripción que han notarizado (Sec. 3.3 del Reglamento para la Inscripción de Partidos por Petición)–, labor que aumenta al preparar sus Registros de Testimonios e Índices Mensuales y Anules requeridos por la Ley Notarial.

La razón legítima del requisito de **exclusividad notarial** que aduce el Estado –evitar candidaturas fraudulentas y frívolas–, a base de que las firmas en las peticiones sean confiables y que las agrupaciones políticas tengan apoyo del electorado, se garantizaban sin afixiar el nacimiento de nuevos partidos.

La Sec. 6.1 del propio Reglamento para la Inscripción de Partidos por Petición fija un proceso de convalidación de peticiones en la **Sección de Validaciones** de la Comisión Estatal, donde sus funcionarios pasan juicio sobre "la corrección, legalidad y validez" de cada petición y las revisan contra los récords y archivos de la Comisión.

Entre los fundamentos para rechazar una petición de inscripción está que "la firma del peticionario [sea] incompatible con la que aparece en su petición de inscripción como elector". Sec. 4.7 (f). Distinto a la tesis mayoritaria, para la Comisión Estatal, un endoso debidamente notarizado no goza totalmente de presunción de corrección y legitimidad.

No albergamos duda de que ante el rechazo mayoritario a un mecanismo alterno que permita que las firmas de las peticiones de endosos sean **también** ante los funcionarios de las Juntas de Inscripciones Permanentes de cada municipio,[17] el requisito de exclusividad notarial establecido por el Art. 3.001 (3) de la Ley Electoral, es inconstitucional: existen medios menos onerosos para salvaguardar los intereses del Estado.

**La decisión de hoy es un ejemplo judicial claro en que la Partidocracia prevalece sobre la Democracia.**

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado

---

[17] Estas Juntas llevan a cabo un proceso **continuo** de inscripciones, transferencias y reubicaciones de electores, asuntos en que tiene que prevalecer la pureza electoral. Su capacidad y disponibilidad a tiempo completo y la autenticación de la firma –avalada por certificaciones emitidas por sus funcionarios– logran los mismos propósitos legislativos.

Este mecanismo **supletorio es adicional al uso de los notarios** y en términos históricos más afín con lo que ha sido la "tradición" respecto a las inscripciones de nuevos partidos. Alivia la onerosidad del reclutamiento de abogados notarios como **única** vía legal disponible en la autenticación de firmas.