EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Luis A. Nieves y Otros<br><br>Demandantes-Peticionarios<br><br>v.<br><br>AM Contractors, Inc. y Otros<br><br>Demandados-Recurridos | Certiorari<br><br>2005 TSPR 181<br><br>166 DPR _____ |

Número del Caso: CC-1998-154

Fecha: 2 de diciembre de 2005

Tribunal de Apelaciones:

> Circuito Regional de San Juan, Panel II

Juez Ponente:

> Hon. José Miranda De Hostos

Abogado de la Parte Peticionaria:

> Lcdo. Julio Fontanet Maldonado

Abogados de la Parte Recurrida:

> Lcdo. Mario Arroyo Dávila
> Lcdo. Charles Bimbela
> Lcdo. Armando Martínez Fernández

Materia: Sentencia Declaratoria e Injunction Permanente


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Luis A. Nieves y Otros

Demandantes-Peticionarios

v.

AM Contractors, Inc. y otros          CC-1998-154
                                                    Certiorari
Demandados-Recurridos


Opinión del Tribunal emitida por la Jueza Asociada SEÑORA FIOL MATTA


En San Juan, Puerto Rico, a 2 de diciembre de 2005.

La revisión de la sentencia dictada en este caso por el entonces Tribunal de Circuito de Apelaciones (en adelante, Tribunal de Apelaciones) nos requiere examinar las medidas tomadas por funcionarios del Estado Libre Asociado de Puerto Rico para controlar el acceso al complejo de vivienda Jardines de Quintana. Reafirmamos la validez constitucional del propósito preventivo y remedial que persigue el Estado al efectuar los llamados cierres de residenciales públicos. No obstante, resolvemos que en este caso las actuaciones de los funcionarios gubernamentales al implantar y operar el sistema de control de acceso en Jardines de Quintana violan los criterios que

hemos adoptado jurisprudencialmente para el cierre de urbanizaciones y para proteger la expectativa legítima de intimidad de los ciudadanos ante bloqueos de carreteras por las autoridades y son contrarias al debido proceso de ley garantizado por nuestra Constitución.

I.

El complejo de vivienda conocido como Jardines de Quintana consta de tres edificios con 36 unidades, un almacén y un centro comunal. Al presentarse el recurso que nos ocupa eran propietarios 100 de los 108 residentes del lugar. La Administración de Vivienda Pública era, a su vez, propietaria de las áreas comunes del complejo y A.M. Contractors, Inc., tenía a su cargo la administración y el mantenimiento de todo el sistema.[1] Jardines de Quintana está ubicado entre las calles Guayama y Francia en Hato Rey. La calle Irlanda lo separa del Residencial Público Juan César Cordero Dávila, conocido como Residencial Quintana. Antes de los hechos que provocan el presente recurso, había también una verja de cemento que servía de barrera física entre las dos comunidades.

Como parte de la política pública del Estado de controlar el tráfico de sustancias controladas y otros delitos, el 7 de septiembre de 1993, efectivos de la Policía y de la Guardia Nacional incursionaron en el Residencial Quintana. Establecieron casetas de vigilancia y se organizó el tránsito vehicular y peatonal. Durante el operativo, se colocaron unas vallas para impedir todo acceso vehicular desde la calle Irlanda Oeste hasta la calle Francia. El 14 de noviembre de 1994, se removieron las vallas y en su lugar se instaló un portón fijo que impidió tanto el tráfico vehicular como el peatonal en esta intersección. El cierre permanente de la calle Irlanda Oeste (calle A) impidió el acceso directo de los residentes de Jardines de Quintana hacia la calle Francia.

---

[1] En 1971 este complejo se incluyó en un programa conocido como "Turn Key III", mediante el cual se le otorgaba a sus residentes la oportunidad de firmar un contrato de arrendamiento con opción a compra. De este modo 100 de los residentes del complejo advinieron propietarios de sus respectivos apartamentos.

A raíz de la intervención policíaca, se establecieron dos estructuras de control de acceso al Residencial Quintana. El primer puesto [control 1] consiste de una caseta de concreto, dos portones eléctricos para entrada y salida de vehículos y un portón peatonal. Este puesto está ubicado en el Residencial Quintana y provee acceso a la calle Francia, a través de la calle B, la cual es paralela a la calle Irlanda (calle A). El segundo puesto [control 2] consiste de una caseta de concreto, dos portones eléctricos para entrada y salida de vehículos y un portón peatonal. Este puesto provee acceso a la calle Guayama por la calle Irlanda Norte (calle C). Al construirse este segundo control de acceso, se destruyó la verja de cemento que hasta entonces había separado al complejo Jardines de Quintana del Residencial Quintana.

Como resultado de lo anterior, Jardines de Quintana y el Residencial quedaron constituidos en una sola unidad residencial, en términos funcionales, con dos controles de acceso, uno en el Residencial propiamente dicho, que es el único acceso a la calle Francia y otro en la intersección de la calle Irlanda y la calle Guayama.

**A los residentes de Jardines de Quintana no se les consultó sobre las medidas descritas ni el control de acceso antes de establecerlo.** Aunque se les ofrecieron tarjetas de identificación, libres de costo, para que tuvieran acceso al área controlada, los residentes decidieron no aceptarlas. Es por esto que, según se desprende de la transcripción del juicio, los residentes de Jardines de Quintana sólo podían entrar a sus residencias a través del control 2, pues la entrada por el control 1 era para los residentes con tarjetas.

Tras las medidas de control de acceso y cierre, ocho[2] residentes de Jardines de Quintana presentaron una demanda sobre sentencia declaratoria e injunction permanente. Alegaron, en síntesis, que al impedirse el acceso vehicular y peatonal directo desde la calle Irlanda Oeste hacia la calle Francia, se les privó

de su vía principal de acceso a los servicios esenciales localizados en esa calle. Además, fueron víctimas de actuaciones de los policías a cargo del-cierre, que son arbitrarias y en clara violación de sus derechos constitucionales.

El 18 de mayo se celebró la vista en su fondo ante el Tribunal de Primera Instancia. Según l**os peticionarios, las personas que transitan a través del segundo puesto de control de acceso [control 2] y no poseen la tarjeta que los identifica como residentes, quedan sujetas a las detenciones y los registros de la policía.**

Por otro lado, al cerrarse la calle Irlanda Oeste de forma permanente, los residentes ya no tienen acceso directo a la calle Francia y, como señaló el foro de instancia en sus determinaciones de hechos, "[p]ara lograr acceso a la parte superior de la Calle Francia, los vecinos de Jardines de Quintana tienen que necesariamente atravesar toda la extensión del Residencial Público Quintana. La prueba indicó
que este trecho es uno extenso, colmado de peligros para los transeúntes". Además, el acceso a la calle Francia es de gran importancia para los residentes de Jardines de Quintana porque en esta calle está localizada la escuela de algunos hijos de residentes, la iglesia a la que asisten muchos de ellos, transportación pública y una variedad de establecimientos comerciales como farmacias y colmados.

La falta de acceso peatonal y vehicular de manera directa hacia la calle Francia, es de vital importancia para los residentes ya que, según la prueba vertida en el juicio, muchos de ellos sufren frecuentes quebrantos de salud o tienen impedimentos físicos. Además, según estableció el foro de instancia en sus determinaciones de hechos, la mayoría de los residentes de Jardines de Quintana tenían, para la época en que se originó este caso, 55 años de edad o más, 65 de las 108 familias recibían los beneficios de seguro social y entre 9 y 15 de los residentes utilizaban un sillón de ruedas para moverse.

---

[2] Según la transcripción del juicio celebrado el 8 de mayo de 1997, la demandante, Sra. Santa Rolón Suárez falleció antes de

Celebrada la vista, que incluyó una inspección ocular, el Tribunal de Primera Instancia declaró con lugar la demanda y ordenó al Administrador de Vivienda Pública y al Secretario de la Vivienda eliminar el portón fijo que fue instalado en la calle Irlanda Oeste y reinstalar, a su costo, la verja de cemento que dividía el complejo de viviendas Jardines de Quintana del Residencial Público Quintana. Además, ordenó al Estado Libre Asociado de Puerto Rico (en adelante el ELA) que satisficiera a los peticionarios la suma de $100,000.00 por concepto de sufrimientos mentales.

Inconforme, el ELA acudió al Tribunal de Apelaciones y éste revocó en su totalidad la sentencia dictada por el Tribunal de Primera Instancia y desestimó la demanda presentada por los residentes de Jardines de Quintana. Éstos, a su vez, recurren ante este Tribunal alegando que el foro apelativo erró al resolver: (1) que la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, no aplica al presente caso, (2) que las actuaciones del ELA fueron válidas, (3) que no procedía la reconstrucción de la verja destruida por el Estado como parte de su operativo y (4) que el Estado es inmune contra reclamaciones de daños por sus actuaciones en el presente caso.

Por los fundamentos que explicamos a continuación, revocamos en su totalidad la sentencia del Tribunal de Apelaciones.

II.

Los peticionarios señalan, en primer lugar, que el foro apelativo intermedio erró al resolver que la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, no aplica al presente caso. Sin embargo, si aplicamos a este caso la norma básica de hermenéutica que nos requiere interpretar una ley, no en forma fraccionada, sino integralmente, a la luz de su propósito, tenemos que concluir que los peticionarios no tienen razón. Mun. San Juan v. Banco Gub. Fomento, 140 D.P.R. 873 (1996); Pueblo v. Ríos Dávila, 143 D.P.R.

dicha vista.

687 (1997); Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. § 14.

La Ley Núm. 21 de 20 de mayo de 1987, 23 L.P.R.A. § 64, *et seq.*, provee un mecanismo para autorizar a urbanizaciones y comunidades residenciales a controlar la entrada a sus calles, siempre que cumplan con ciertos requisitos. El propósito principal de esta ley es proveer a la ciudadanía un instrumento adicional para combatir la criminalidad, procurando su participación activa en la lucha contra el crimen, cosa que "al mismo tiempo disminuye la labor de vigilancia, ya sobrecargada, que presta la Policía de Puerto Rico". Exposición de Motivos, Ley Núm. 21 de 20 de mayo de 1987, Leyes de Puerto Rico, pág. 67. Véase, Caquías v. Asoc. Res. Mansiones de Río Piedras, 134 D.P.R. 181 (1993).

La ley dispone el procedimiento que deben seguir las comunidades para obtener el permiso o autorización de control de acceso. 23 L.P.R.A. §§ 64-64(b). Hemos resuelto que "la Ley de Control de Acceso delega poder tanto a los municipios como a las asociaciones de residentes para poner en vigor la legislación". Asociación v. Cardona Rodríguez, 144 D.P.R. 1, 26 (1997). A los municipios se les delega la facultad de reglamentar y conceder los permisos conforme a los procedimientos y criterios esbozados en la propia ley y en el reglamento de planificación aplicable. Las asociaciones de residentes debidamente registradas en el Departamento de Estado y autorizadas por el municipio están facultadas para administrar y mantener los sistemas de control del tráfico y del uso de las vías públicas. *Id.*

En su primera sección, la Ley Núm. 21 autoriza a los municipios a conceder permisos para "el control del tráfico de vehículos de motor y del uso público de las vías públicas en paseos peatonales, calles, urbanizaciones y comunidades residenciales, públicas o privadas...", 23 L.P.R.A. § 64. La ley contempla, únicamente, situaciones en las que los residentes de una comunidad específica se organizan en asociaciones, consejos o juntas que solicitan tales permisos, luego de estar debidamente

inscritas en el Departamento de Estado como instituciones sin fines de lucro. 23 L.P.R.A. § 64(a).

El estatuto no contempla situaciones como la que tenemos ante nuestra consideración. En este caso, la Guardia Nacional y la Policía de Puerto Rico clausuraron las entradas al Residencial Público Quintana en virtud del poder otorgado por las Órdenes Ejecutivas OE-1992-65 y OE-1993-08, para regular el tránsito vehicular y peatonal de una vía pública y así atacar el problema de criminalidad y tráfico de drogas. La presente situación resulta, pues, del ejercicio del poder de razón del Estado, bajo el cual los funcionarios de la rama ejecutiva del ELA efectúan el deber y función general del Primer Ejecutivo de cumplir y hacer cumplir las leyes.

Siendo ello así, es forzoso concluir que la Ley Núm. 21 de 20 de mayo de 1987 no rige la controversia planteada en este caso. Según explicamos, tanto la letra de la ley como la expresión del propósito legislativo van dirigidas a las actuaciones de los propios residentes de las comunidades y no a las del Estado.[3] Actuó correctamente el Tribunal de Apelaciones al resolver que la Ley Núm. 21, *supra*, no rige en este caso.

III.

_____

[3] Sin entrar en una discusión sobre la aplicación retroactiva de las leyes, cabe mencionar, por su pertinencia al asunto que hoy examinamos, que mediante la Ley Núm. 336 de 30 de diciembre de 1998, 23 L.P.R.A. § 64(c), nuestra Asamblea Legislativa añadió un tercer párrafo a la sección 5 de la referida Ley Núm. 21:

> Las disposiciones de esta sección no son de aplicación a las actuaciones del Estado en su función de reglamentar el tráfico y acceso vehicular y peatonal a las urbanizaciones, calles y o comunidades residenciales públicas y privadas, por razón de la seguridad, salud o bienestar general, incluyendo, sin que se entienda como una limitación, a las operaciones de la Policía de Puerto Rico o de la Guardia Nacional de Puerto Rico cuando dichas fuerzas sean movilizadas por las autoridades pertinentes para actuar en apoyo de las fuerzas de seguridad pública, en operaciones para combatir la criminalidad y el narcotráfico, o restablecer la seguridad pública...

**El propósito expreso de la Asamblea Legislativa es establecer, categóricamente, que dicha Ley no es de aplicación a las actuaciones estatales, como los operativos de rescate de los residenciales públicos de alta incidencia criminal**. Exposición de Motivos, Ley Núm. 336 de 30 de diciembre de 1998.

El segundo señalamiento de error de los peticionarios gira en torno a la constitucionalidad de las actuaciones del Estado. Alegan que los funcionarios violentaron sus derechos a la intimidad, a la dignidad, a la libertad de expresión y culto y a no ser objeto de registros y allanamientos irrazonables. Además, alegaron que las actuaciones del Estado violentaron el debido proceso de ley de los residentes de Jardines de Quintana. Según concluyó el Tribunal de Primera Instancia, los peticionarios no han cuestionado la facultad constitucional del Gobernador para activar las milicias en situaciones de emergencia que constituyen un riesgo a la seguridad pública.[4] Plantean más bien que dicha activación no justifica tomar medidas que priven a los ciudadanos de derechos fundamentales garantizados por la Constitución, especialmente en ausencia de prueba demostrativa de que existe una situación de emergencia.

Las actuaciones de los funcionarios del Ejecutivo en este caso, a saber, la Policía y la Guardia Nacional, se produjeron en virtud de una serie de Órdenes Ejecutivas promulgadas por el Gobernador de Puerto Rico. Dichas órdenes intentaban responder al acelerado aumento en el índice de la criminalidad y el tráfico de sustancias controladas,

mediante la incursión de funcionarios del orden público en los residenciales públicos de más alta incidencia criminal. Mediante estas órdenes ejecutivas se desarrolló un programa de prevención del crimen al cual se integró no sólo la Policía de Puerto Rico y la Guardia Nacional, sino numerosas agencias públicas.

La Orden Ejecutiva OE-1992-65 estableció el proyecto de "rescate" de residenciales públicos y creó un "Plan de Acción Inmediata de servicios a residenciales de alta incidencia criminal con el objetivo de reducir la criminalidad en los residenciales públicos más afectados". Dicho plan estaría a

---

[4] Conforme a la sección 206 de la Ley Núm. 62 de 23 de junio de 1969, según enmendada, 25 L.P.R.A. § 2057, el Gobernador de Puerto Rico será el Comandante en Jefe de las Fuerzas Militares de Puerto Rico. Disponen a su vez las secciones 207 y 225 que éste podrá ordenar la movilización de las Fuerzas Militares, cuando cualquier perturbación grave del orden o seguridad pública lo

cargo de un coordinador adscrito a la Administración de Vivienda Pública, con el apoyo de un Comité Asesor integrado por los jefes de la Administración de Vivienda, el Departamento de Servicios Sociales, el Departamento de Servicios contra la Adicción, el Departamento de Recreación, el Departamento de Justicia y la Policía de Puerto Rico. La Orden concedía facultad al Comité Asesor, en conjunto con el coordinador, para determinar los residenciales públicos que debían incluirse en el plan de acuerdo a su nivel de incidencia criminal, solicitar la ayuda y el personal necesario y recabar de entidades privadas la ayuda necesaria en la consecución del plan. El plan promovía el desarrollo de estrategias creativas e innovadoras mediante la coordinación de los recursos de las entidades públicas y privadas, con miras a reducir la incidencia criminal en las comunidades afectadas. Véase OE-1992-65, promulgada el 6 de noviembre de 1992.

La OE-1993-08 expresa que debido a un aumento en el tráfico de drogas, la Policía de Puerto Rico "no da abasto". Por tal razón, dispone que se integre al servicio militar activo a los miembros de la Guardia Nacional que fueran necesarios para brindarle ayuda a la Policía de Puerto Rico en funciones dirigidas al control del tráfico de narcóticos. El Ayudante General de Puerto Rico sería el responsable de la operación militar y de los efectivos, las armas y los servicios a usarse. Los miembros de la Guardia Nacional proveerían, entre otros, servicios de transportación, de vigilancia, médicos y de seguridad. Véase OE-1993-08, promulgada el 25 de febrero de 1993.

Se autorizó, además, el desembolso de fondos con el propósito de poder ejecutar la OE-1993-08. Véase OE-1993-22, promulgada el 4 de junio de 1993. La OE-1993-22 reitera que el objetivo es movilizar los recursos de las fuerzas militares de Puerto Rico para mantener la ley y el orden y garantizar la seguridad de la vida y la propiedad del gobierno y los ciudadanos.

Las órdenes ejecutivas a las que hemos hecho referencia expresan claramente la política pública de desarrollar nuevos

---

requiera y cuando las autoridades civiles no pudieran afrontar

programas de prevención, con el objetivo de reducir la incidencia criminal en los residenciales públicos y mejorar la calidad de vida de sus residentes. No se trata de que el Estado intervenga con un individuo con el único fin de incautarse de evidencia criminal o con la intención general de hacer cumplir las leyes; la naturaleza preventiva de la política pública adoptada en las órdenes ejecutivas reseñadas es evidente.

No nos corresponde pasar juicio sobre la sabiduría de la política pública así establecida ni los medios escogidos por el Gobernador para implantarla. Asociación v. Cardona Rodríguez, *supra*. Como intérprete final de la Constitución y las leyes del Estado Libre Asociado de Puerto Rico, la función indelegable de este Tribunal se activa cuando las determinaciones de política pública y las correspondientes actuaciones de las otras dos ramas de Gobierno confluyen con los derechos individuales garantizados por nuestra Constitución. Véase, Silva v. Hernández Agosto, 118 D.P.R. 45 (1986). Examinemos a continuación aquellos derechos fundamentales de los peticionarios que se encuentran afectados por las actuaciones gubernamentales antes descritas.

IV.

Los peticionarios plantean que las actuaciones del Estado vulneran el derecho a la intimidad de los residentes de Jardines de Quintana y sus visitantes. Este derecho emana de la sección 8, artículo II de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico y del principio de inviolabilidad de la dignidad del ser humano consagrado en la sección 1 de dicha Carta de Derechos.[5] La salvaguarda de este derecho es el propósito y fundamento para la protección contra registros y allanamientos irrazonables dispuesta en la sección

---

las mismas. 25 L.P.R.A. § 2058, 2076.

[5] Disponen dichas secciones lo siguiente:

"La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley...." Const. E.L.A. art. II, § 1. "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Const. E.L.A. art. II, § 8.

10 del artículo II de nuestra Constitución.[6] Hemos resuelto que el derecho a la intimidad es de considerable envergadura y goza de la más alta jerarquía en nuestro entramado de derechos constitucionales. Véanse, Vega Rodríguez v. Telefónica de P.R., res. el 17 de abril de 2002, 156 D.P.R. __ (2002), 2002 T.S.P.R. 50; Pueblo v. Santiago Feliciano, 139 D.P.R. 361 (1995); Arroyo v. Rattan Specialties, 117 D.P.R. 35 (1986).

Sin embargo, el derecho a la intimidad no se ejerce en el vacío, sino "en el centro mismo de nuestros vecindarios y, por ende, su práctica no está inmune a la intervención moderadora del Estado." Asociación v. Cardona Rodríguez, supra, en la pág. 31. Hay que tener presente que, de ordinario, debe tolerarse cierto grado razonable de intromisión en la intimidad ciudadana, cuando así lo exijan problemas apremiantes de salud y de seguridad pública. Id. Véase además, ELA v. Coca Cola Bottling Co., 115 D.P.R. 197 (1984). Por tal razón, en Asociación v. Cardona Rodríguez, supra, este Tribunal afirmó la constitucionalidad de la llamada Ley de Control de Acceso, antes discutida. Tomando en consideración tanto el derecho a la intimidad, como el interés del estado en procurar la participación ciudadana en la lucha contra el crimen, establecimos unos parámetros que permiten a las asociaciones de residentes controlar el acceso a sus áreas residenciales con un mínimo de intervención con la privacidad. Id.

Además, concluimos que "controlar", en el contexto allí examinado, implica regular o vigilar el acceso a las vías pero "no equivale a una incautación de la persona". Id. en la pág. 36. Hicimos énfasis en que la Ley de Control de Acceso no autorizó a las asociaciones de residentes a efectuar arrestos

---

[6] Dicha sección dispone lo siguiente:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.[...] Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación... Evidencia obtenida en violación de esta sección será inadmisible en los tribunales. Const. E.L.A. art. II, § 10.

o registrar a las personas o automóviles. Manifestamos que las compañías de seguridad

privadas sólo podrán efectuar arrestos y/o registros válidos como personas particulares, en aquellas circunstancias en que nuestro ordenamiento procesal vigente permite tales arrestos. Por esa razón, no fue necesario analizar la Ley de Control de Acceso a la luz de la sección 10 del artículo II de nuestra Constitución.[7]

El caso que hoy nos ocupa presenta la situación contraria. Estamos ahora ante una actuación gubernamental, en la que la Policía y la Guardia Nacional controlaron los accesos a las calles principales de una comunidad. Tratándose de una actuación gubernamental, debemos examinarla a la luz de la sección 10 del artículo II de nuestra Constitución, que delimita el grado de intrusión estatal permisible en el ámbito de intimidad individual.

Sabemos que el criterio rector para evaluar la constitucionalidad de una acción estatal determinada es la razonabilidad. A su vez, para determinar si la acción gubernamental es razonable es imprescindible precisar la expectativa de intimidad que puede albergar una persona en determinadas circunstancias. Si se reconoce que en cierto contexto hay una expectativa legítima de intimidad, cualquier actuación gubernamental que pretenda interferir en ese ámbito debe ser razonable, de acuerdo a las circunstancias específicas del caso. En otras palabras, mientras mayor sea la expectativa legítima de intimidad, mayor será la restricción al Estado. De ahí que el análisis se haga de acuerdo a la doctrina de balance de intereses, sopesando los intereses del Estado frente a los

---

[7] Nuestra decisión, sin embargo, no excluyó la posibilidad de que una intervención en las entradas de la comunidad que alcance el grado funcional de un arresto o una incautación de la persona active la protección de la sección 10, artículo II de la Constitución del Estado Libre Asociado de Puerto Rico. Esto sucedería cuando a la luz de la totalidad de las circunstancias que rodean el incidente, una persona razonable no se hubiese sentido en libertad para marcharse del lugar. Asoc. Pro Control de Acceso v. Cardona Rodríguez, *supra*, en la pág. 36-37.

derechos individuales. Véase Pueblo v. Lebrón, 108 D.P.R. 324 (1971).

Indiscutiblemente, hay una expectativa legítima de intimidad con respecto a un automóvil, aunque la consiguiente protección constitucional tiene un alcance menor. Pueblo v. Yip Berríos, 142 D.P.R. 386 (1997); Pueblo v. Malavé González, 120 D.P.R. 470 (1988); Pueblo v. Sosa Díaz, 90 D.P.R. 622 (1964). Por eso, como regla general, se requiere algún grado de sospecha centrada para poder efectuar detenciones vehiculares válidamente. En Pueblo v. Yip Berríos, supra, en la pág. 411, reconocimos que en ciertas y limitadas circunstancias el requisito de causa probable para detenciones vehiculares podría resultar en una carga demasiado onerosa para la protección del interés público. Adoptamos entonces los siguientes criterios, para determinar la razonabilidad de tales intervenciones:

> (1) la magnitud del interés público que motiva la realización del bloqueo,
>
> (2) el grado con que éste adelante dicho interés,
>
> (3) el alcance de la intrusión con la intimidad. Id.

La evaluación de los hechos y circunstancias de cada caso a la luz de dichos criterios es determinante para decidir si la disminución en el alcance de la protección constitucional resulta razonable. De esa forma, para determinar la validez de los bloqueos de carreteras en nuestra jurisdicción hay que sopesar su razonabilidad, de acuerdo a los hechos específicos de cada caso. Id. Además, hemos sostenido, como norma general, que "la utilización de bloqueos de carreteras con propósitos generales [de hacer cumplir la ley] es ilegal. De igual modo, el Estado no puede postular la existencia de un objetivo legítimo como pretexto para adelantar objetivos que no satisfacen el escrutinio constitucional". Id.

Esta norma es consistente con la jurisprudencia federal. En City of Indianapolis v. Edmond, 531 U.S. 32 (2000), el Tribunal Supremo de los Estados Unidos invalidó una práctica de la ciudad de Indianapolis de efectuar bloqueos de carreteras con el propósito expreso de combatir el tráfico de narcóticos

ilegales. El Tribunal Supremo federal concluyó que la detención de los vehículos de motor en tales circunstancias constituye una incautación que activa la protección de la Cuarta Enmienda Federal. Al sopesar los intereses para determinar la razonabilidad de tal práctica, el Tribunal consideró, primero, si el objetivo principal del bloqueo era suficiente para justificar el grado de intrusión en la intimidad individual que supone la detención de un vehículo de motor. Reconoció que sólo se han admitido excepciones muy limitadas a la regla que exige algún grado de sospecha centrada para que la detención de una persona sea razonable y concluyó que el interés general en combatir el tráfico de drogas no es una excepción. Entendió el Tribunal Supremo federal que si se valida una práctica tan altamente generalizada, serían pocas las salvaguardas contra la potestad de las autoridades para efectuar bloqueos de carreteras, siempre que éstos pudieran vincularse en algún grado al propósito de hacer cumplir las leyes. En tal caso, la Cuarta Enmienda de la Constitución de los Estados Unidos de América, análoga a la sección 10 del artículo II de nuestra Constitución, poco serviría para evitar que tales intrusiones en la intimidad se conviertan en una práctica cotidiana. *Id.*

Una vez se establece que existe un objetivo estatal válido, es necesario determinar en qué medida el bloqueo adelanta el interés público que se desea proteger. Como regla general, la disponibilidad de alternativas menos onerosas y menos lesivas, que adelanten igualmente los objetivos gubernamentales, justifica invalidar el bloqueo. Pueblo v. Yip Berríos, *supra*, en la pág. 412.[8] Esto nos lleva al tercer elemento que debe incluirse en el balance de intereses para determinar la razonabilidad de un bloqueo de carreteras: el alcance de la intrusión en la intimidad. Pueblo v. Yip Berríos, *supra*, en la pág. 413.

---

[8] Véase, Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990): La detención de vehículos en bloqueos de carretera con el fin de reducir los accidentes causados por conductores ebrios, adelanta el interés público de manera directa; permite

El grado de lesión a la intimidad en estos casos debe ser el mínimo necesario para adelantar el interés estatal. Esto se determina mediante un doble análisis, con dimensiones tanto objetivas como subjetivas. *Id.* Desde el punto de vista objetivo, la intrusión a la intimidad individual consiste en la detención propiamente dicha, la inspección visual y cualquier tipo de intercambio entre los agentes y el detenido. *Id.* en la pág. 404. Por otra parte, desde la perspectiva subjetiva, la intrusión se caracteriza por el sentimiento de aprehensión, temor o sorpresa que ocasiona la detención. *Id.*

En <u>Asociación v. Cardona Rodríguez</u>, *supra*, establecimos el máximo de intromisión a la intimidad individual permisible para que las detenciones en las

---

identificar y sacar de la carretera al conductor ebrio en el momento, previniendo así un posible accidente.

entradas de comunidades residenciales puedan considerarse razonables. En virtud de la **similitud del interés** que se interesa proteger mediante el control de acceso establecido en el presente caso, extendemos a éste los parámetros constitucionales que establecimos en aquél para minimizar la intrusión a la intimidad desde el punto de vista objetivo.

Acorde a lo resuelto en <u>Asociación v. Cardona Rodríguez</u>, *supra*, en las págs. 38-40*,* cuando se pretende detener un vehículo de motor o a un peatón, en la entrada de un área residencial:

(1)   Las indagaciones deben limitarse a preguntar a dónde se dirige el residente no identificado o visitante, o, en su defecto, el propósito de la visita.

(2)   Se podrá indagar sobre la identidad del residente no reconocido como tal o del visitante y mantener un registro de los visitantes, cuando el residente preste su consentimiento expreso. De ser éste el caso, la información registrada se limitará a aquella que es perceptible a simple vista, como son las horas de entrada y salida, las características del vehículo y la tablilla.

(3)   En ausencia de sospecha centrada, **no se debe detener al conductor de un vehículo para examinar la licencia de conducir.** Como método menos oneroso para confirmar la identificación de la persona, se puede anotar el número de tablilla del vehículo de motor, que está a simple vista.

(4)   En ningún momento se puede negar el acceso a las calles controladas para el ejercicio de actividades constitucionalmente protegidas, tales como la libertad de expresión, libertad de asociación, libertad de culto, entre otras.

(5)   Los residentes o visitantes no tendrán que detenerse por más tiempo que el que razonablemente toma hacer las mencionadas averiguaciones.

(6)   Por último, nada impide que se expidan o utilicen marbetes, calcomanías o impresos que faciliten la identificación de los residentes o sus automóviles, **pero no se obstaculizará la entrada de éstos a su comunidad cuando opten por no utilizar tales identificaciones.**

En cuanto a la intrusión subjetiva, ésta se minimiza limitando el elemento de aprehensión o sorpresa que genera el bloqueo. Véase, <u>Pueblo v. Yip Berríos</u>, *supra*; <u>Asociación v. Cardona Rodríguez</u>, *supra*. Por consiguiente, el bloqueo debe ser claramente visible y la iluminación del área y el uso de avisos son sumamente importantes. La interferencia con el flujo normal del tránsito debe ser mínima y, además, la

operación del punto controlado de acceso debe garantizar la seguridad de los que por allí transitan.

En Asociación v. Cardona Rodríguez, *supra*, establecimos también que se debe notificar o advertir a todo visitante potencial de los requisitos que debe cumplir y la información que se le pedirá en la entrada. Se deben colocar letreros que avisen, a una distancia razonable de la entrada, que los visitantes tendrán que parar sus vehículos brevemente con el propósito de informar su nombre, destino o propósito. De esta manera, el visitante que no esté de acuerdo puede retroceder antes de detenerse frente a la persona encargada de controlar el acceso, limitando así la intrusión subjetiva con la intimidad. Señalamos además, que en ningún momento se puede detener a un residente así identificado o reconocido, en ausencia de sospecha centrada o motivos fundados, porque éste no tiene la libertad de retroceder: **es el acceso a su residencia el que se encuentra controlado**. Estas guías delimitan el máximo de interferencia con la intimidad individual permisible cuando se detienen vehículos de motor con motivo del control de acceso de una zona residencial.[9]

En Pueblo v. Yip Berríos, *supra*, reconocimos la necesidad de que las actuaciones de los agentes estatales respondieran a guías previamente establecidas para eliminar la posibilidad de arbitrariedad. Conforme a esto, resolvemos que los oficiales supervisores deben establecer guías y normas basadas en los criterios antes esbozados, que limiten la discreción de los agentes que laboran en bloqueos o en puntos de control de acceso. **Estas normas, a su vez, deben cumplirse**

---

[9] En cuanto a los peatones, señalamos específicamente que la detención para obtener información no constituye una detención que active la protección contra registros y allanamientos irrazonables, siempre que el agente del orden público no restrinja la libertad del individuo. **En otras palabras, la conversación debe ser voluntaria y espontánea, no puede haber ningún grado de restricción, no puede mediar coacción, intimidación y mucho menos fuerza o violencia por parte de los guardias. La razonabilidad depende de si una persona prudente y razonable, inocente de todo delito, pensaría que no está en libertad de marcharse**. Pueblo en el interés del menor, N.O.R., 136 D.P.R. 949, 956-959 (1994). Entiéndase por ello, que estos parámetros aplican en el caso de acceso peatonal al área

**estrictamente**. Esto imprime razonabilidad a la detención vehicular o peatonal en un punto de control de acceso de un área residencial por agentes del orden público, presumiendo, claro está, que esté presente un interés estatal válido. De haber un interés estatal válido y seguirse unas guías basadas en los criterios que adoptamos en Pueblo v. Yip Berríos, *supra*, y Asociación v. Cardona Rodríguez, *supra*, la detención vehicular o peatonal por parte de agentes del Estado será permisible bajo nuestro esquema constitucional.

Reiteramos que la razonabilidad de cualquier bloqueo de carreteras, sea temporero, como en Pueblo v. Yip Berríos, *supra*, o permanente, como los controles de acceso en el presente caso se sujetará al análisis que hemos realizado. **Los agentes del orden público están obligados a observar las guías que desde Pueblo v. Yip Berríos, *supra*, dispusimos que eran imprescindibles para la validez de un bloqueo de carreteras y que hoy requerimos de igual forma, junto con los criterios adoptados en Asociación v. Cardona Rodríguez, *supra*, para la validez de operativos como los del caso de autos.**[10]

V.

Los peticionarios también alegan que las actuaciones del Estado violaron el derecho al debido proceso de ley de los residentes de Jardines de Quintana.

El derecho constitucional al debido proceso de ley, en su modalidad procesal, está garantizado por el artículo II, sección 7 de la Constitución del Estado Libre Asociado de Puerto Rico. Dicha sección dispone: "Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad... Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley...". Const. E.L.A., Art. II, § 7. En su vertiente procesal, la cláusula del debido proceso

residencial controlada, siempre que no restrinjan irrazonablemente la libertad del individuo transeúnte.

[10] Además, reiteramos la importante y consabida norma de que ante una impugnación judicial de este tipo de actuación, le corresponde al Estado probar su razonabilidad. Véase, Pueblo v. Bonilla Bonilla, 149 D.P.R. 318 (1999); Pueblo v. Blase

de ley "le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y de propiedad del individuo se haga a través de un procedimiento que, en esencia, sea justo y equitativo". <u>P.A.C. v. E.L.A.</u>, 150 D.P.R. 359, 376 (2000). Reiteradamente hemos expresado que "el debido proceso de ley procesal no es un molde riguroso que se da en el abstracto, pues su naturaleza es eminentemente circunstancial y pragmática, no dogmática. Cada caso exige una evaluación concienzuda de las circunstancias envueltas". *Id*. Esta protección

---

Vázquez, 148 D.P.R. 618 (1988); <u>E.L.A. v. Coca Cola Bottling Co.</u>, 115 D.P.R. 197 (1984).

constitucional se activa cuando está en juego un interés individual de libertad o propiedad. Una vez cumplida esta exigencia, procede que se determine el procedimiento a seguir. *Id*. Al determinar las garantías a ofrecerse "hay que analizar conjuntamente los intereses gubernamentales y los de la persona afectada". <u>Vélez Ramírez v. Romero Barceló</u>, 112 D.P.R. 716, 730 (1982).

VI.

De acuerdo con el marco doctrinario expuesto, concluimos que las actuaciones del Estado en Jardines de Quintana y en el Residencial Quintana son inconstitucionales, por interferir irrazonablemente con el derecho a la intimidad de los peticionarios y por no ofrecer las garantías mínimas que requiere el debido proceso de ley garantizado por nuestra Constitución. Veamos.

Las órdenes ejecutivas a las que hemos hecho referencia demuestran el propósito preventivo y remedial del Estado al implantar los llamados cierres de los residenciales públicos. **Se trata de un interés gubernamental válido**, enmarcado dentro de la obligación del Estado de velar por la seguridad de los ciudadanos y sus propiedades, que va más allá del interés general en combatir el crimen y detectar evidencia de conducta delictiva invalidado en <u>City of Indianápolis v. Edmond</u>, *supra*.

El interés gubernamental presente en este caso va dirigido a la **prevención**, en aras de "salvaguardar precisamente el sosiego, la paz, y la tranquilidad de la vida comunitaria, factores... que son parte del derecho a la dignidad e intimidad del ser humano, derechos de posición preferente en nuestro esquema constitucional." <u>Asociación v. Cardona Rodríguez</u>, *supra*, en la pág. 33 (citas omitidas). Sin embargo, según explicamos anteriormente, la validez de la intención estatal no conlleva necesariamente la validez constitucional de las medidas tomadas para implementarla.

En el presente caso, las actuaciones de los agentes del orden público exceden el máximo de intervención permitido por nuestra Constitución. Según prueba desfilada en el juicio y creída por el Tribunal de Primera Instancia, los agentes del orden público detienen tanto a los residentes como a los visitantes y no permiten la entrada sin antes requerir que se les muestren la licencia de conducir y la licencia del vehículo. Además, anotan las tablillas de los autos y direcciones de los conductores. Cuando se trata de visitantes, anotan a dónde se dirigen, sin el consentimiento previo de los residentes. Estas detenciones se efectúan independientemente de la hora, de que se tenga sospecha centrada alguna, o de la ausencia de consentimiento previo de los residentes.

Más importante aún, en este caso **el Estado no presentó prueba sobre las instrucciones dadas a los agentes con relación al acceso, registro y detención de los visitantes o de los residentes**. No hay prueba alguna de estándares o criterios neutrales que limiten las actuaciones de los agentes. Véase, <u>Pueblo v. Yip Berríos</u>, *supra*, en las págs. 418-419.

**El Estado tampoco desfiló prueba sobre la visibilidad del bloqueo, ni sobre los avisos de la detención y la información que se requeriría antes de permitir la entrada al residencial.** Por el contrario, según la prueba recibida, el visitante no tiene la alternativa de retroceder antes de detenerse frente al guardia y los agentes del orden público detienen de manera irrazonable a los peatones. Por todo ello, la intromisión subjetiva con la intimidad también es excesiva. Además, el Estado no presentó prueba pertinente en cuanto a la medida en que el programa de "rescate" y el subsiguiente control de acceso, adelantan el interés público en prevenir el crimen y salvaguardar el sosiego y la tranquilidad de la vida comunitaria.[11]

---

[11] Por el contrario, las determinaciones de hechos del Tribunal de Primera Instancia revelan un ánimo de aprehensión y temor en

En fin, el objetivo de prevención y rehabilitación no justifica la intrusión en la intimidad individual que representan los bloqueos permanentes en el caso de autos. Éstos resultan equivalentes a la incautación de toda una comunidad,[12] debido a la inexistencia de guías previas y limitaciones a las actuaciones de los agentes del orden público. Tampoco se configura excepción alguna que justifique tal ausencia de normas, como las reconocidas en Pueblo v. Yip Berríos, *supra*, en la pág. 414, ante la falta de prueba que demuestre una verdadera situación de emergencia o de grave riesgo a la seguridad de las personas o sus propiedades.

Por todo lo anterior, resolvemos que erró el Tribunal de Apelaciones al validar las actuaciones del Estado en este caso. Éstas violentan la protección constitucional contra registros y allanamientos irrazonables. El objetivo principal que motiva el bloqueo permanente de estas carreteras es válido, pero en el balance, no se justifica el grado de intrusión ejercido sobre la intimidad de los residentes demandantes.[13]

Por otro lado, en Asociación v. Cardona Rodríguez, *supra*, señalamos:

> El derecho de la ciudadanía al uso y disfrute de los lugares públicos es básico dentro del esquema de valores de nuestro sistema democrático. Sin embargo, esto no significa que los ciudadanos tengan un derecho absoluto a su uso. El Estado, en el ejercicio de su poder *parens patriae*, puede válidamente reglamentar el uso que se le dará a las calles siempre y cuando la reglamentación o legislación adoptada al respecto no interfiera de forma irrazonable con los derechos constitucionales de los individuos.
>
> En este contexto, el derecho a la libertad de movimiento o a discurrir libremente por las vías públicas ha sido reconocido como un derecho con valor propio, y no solamente como uno necesario

---

los residentes, atribuido a la presencia de la policía y a los cambios efectuados a las vías públicas.

[12]   El cierre de todas las vías de acceso a un residencial, obligando a sus residentes a entrar y salir por el bloqueo, constituye "más que un bloqueo de carreteras, nos encontramos ante **una ocupación de una comunidad en particular**". Pueblo v. Yip Berríos, *supra*, en la pág. 418 (énfasis nuestro).

[13]  La actuación gubernamental violenta las secciones 8 y 10 del artículo II de nuestra Constitución, por lo que no es necesario atender los otros planteamientos de índole constitucional.

> para el ejercicio de otros garantizados
> constitucionalmente. Sin embargo, tampoco es
> absoluto. El Estado puede reglamentar su ejercicio
> dentro de los parámetros de nuestro ordenamiento
> constitucional. <u>Asociación v. Cardona Rodríguez</u>,
> *supra*, en la pág. 29-30 (citas omitidas).

No hay duda, pues, de que los residentes de Jardines de Quintana tienen, además del derecho a disfrutar de su propiedad, un derecho libertario de transitar libremente por las vías públicas. Esta privación de libertad redunda, a su vez, en el menoscabo del disfrute de su propiedad.

Según indicamos en un principio, la Ley Núm. 21 no aplica al caso de autos. El cierre de las comunidades Jardines de Quintana y Residencial Quintana que llevó a cabo el Estado como parte del operativo para controlar la criminalidad en los residenciales públicos de alta incidencia criminal no está regulado por ley.[14] También resolvimos que si bien no podemos catalogar la situación que originó el operativo como una "emergencia" debemos proteger y avalar la actuación del Estado como un ejercicio válido del poder de razón de estado. Ello, sin embargo, no justifica que el Estado actúe de manera arbitraria, en violación al derecho al debido proceso de ley de los residentes en el proceso de cierre de su comunidad.

El cierre de estas comunidades era parte de un plan estructurado que consistió de dos fases. En primer lugar, la Policía y la Guardia Nacional ocuparon las comunidades objeto del operativo y establecieron un cierre provisional. En una segunda fase llevaron a cabo el cierre permanente, tras construir estructuras de control de acceso y cerrar ciertas vías de acceso permanentemente. En el caso de autos, transcurrió más de un año desde la ocupación y cierre provisional hasta que se estructuró el cierre de manera permanente. Durante ese período, según las determinaciones de hechos del foro de instancia, el Estado "no notificó a los demandantes ni consultó a éstos con anterioridad al establecimiento del control de acceso... Tampoco se convocó a la ciudadanía afectada por el cierre para

---

[14] Según el foro de instancia, la parte demandada "no aportó evidencia alguna indicativa de la existencia de actividad delictiva en Jardines de Quintana".

conocer sus comentarios orales o escritos en audiencias públicas".

Por todo lo expuesto, no podemos reconocerle a los residentes de una comunidad objeto de un cierre como el de autos el derecho a que se les permita utilizar determinada vía de acceso a su propiedad. Sin embargo, en este caso hubo un largo período de transición antes de establecerse el cierre permanente. Resolvemos que en esas circunstancias, debido a la naturaleza de los intereses envueltos y a la necesidad del Estado de actuar de manera inmediata resulta garantía suficiente conceder ciertos derechos mínimos en una etapa posterior a la ocupación inicial y al cierre provisional. En esa etapa, el Estado deberá auscultar las necesidades de los residentes y tomar en consideración sus inquietudes al estructurar finalmente el cierre permanente.

Estas exigencias encuentran apoyo en la política pública establecida en la Ley de la Administración de la Vivienda Pública de Puerto Rico, Ley Núm. 66 del 17 de agosto de 1989. La sección 1007 de esta ley regula los programas de construcción, mejoras y reparación de residenciales públicos y dispone:

> [...] La Administración tendrá la obligación de establecer, mantener y poner en ejecución los programas que sean necesarios para el mantenimiento, limpieza, ornato de los residenciales públicos y para llevar a cabo las reparaciones ordinarias y extraordinarias, mejoras y obras de modernización de la planta física de los residenciales públicos. El Administrador podrá contratar con los municipios la realización de tales servicios y obras, siempre y cuando éstos tengan la capacidad para llevarlos a cabo. **Asimismo, deberá promover la participación de los residentes en estos programas para fortalecer el sentido de pertenencia a su comunidad y el fortalecimiento de las familias.** 17 L.P.R.A. § 1007 (2000 & Supl. 2005) (énfasis nuestro).

En el caso de autos, ambas comunidades estaban bajo la jurisdicción de la Administración de Vivienda Pública.[15]

---

[15] En 1968 la extinta Corporación de Renovación Urbana y Vivienda de Puerto Rico (CRUV) adquirió el Residencial Jardines de Quintana. Con la aprobación de la Ley Num. 134 de 13 de diciembre de 1994 se traspasó a favor de la Administración de Vivienda Pública "todo residencial público que forme parte del inventario de propiedades de la extinta CRUV. La Administración de Vivienda Pública continuará manejando los programas relacionados a estas propiedades según facultades conferidas en la Ley Núm. 66 de 17

El cierre permanente debió cumplir, en la medida en que fuera posible según los objetivos del Estado, la política pública imperante en la legislación vigente. Debemos recordar que "[l]as diferentes instituciones del Estado, la organización social y las expresiones oficiales de las instituciones gubernamentales, forman un todo integral que debe visualizarse como una entidad y no como partes separadas de una desorganización institucionalizada del azar". BERNIER Y CUEVAS SEGARRA, APROBACIÓN E INTERPRETACIÓN DE LAS LEYES EN PUERTO RICO 483 (1987).

En Comité Pro Permanencia de la Barriada Morales v. Miranda Marín, res. el 16 de octubre de 2002; 157 D.P.R. __ (2002); 2002 T.S.P.R. 138, resolvimos que el procedimiento establecido por la Ley de Municipios Autónomos para el cierre de calles no aplicaba a un cierre temporero mediante orden ejecutiva del alcalde. Señalamos que "[e]s evidente que un cierre permanente de una vía municipal tiene consecuencias y efectos de mucho mayor alcance que un mero cierre provisional para fines temporeros, como es el caso de autos. Por ello se justifica que para aquél la ley requiera seguir un procedimiento elaborado como el que establece la referida sección." Id.

Al controlar accesos y cerrar vías de manera permanente el Estado está interfiriendo con derechos libertarios protegidos por nuestra Constitución. Sin embargo, por razón de los intereses apremiantes envueltos sólo se deben conceder aquellas garantías que resulten viables para el Estado según las circunstancias particulares. En el caso de autos los residentes de Jardines de Quintana demostraron ante el Tribunal de Primera Instancia razones concretas para solicitar acceso directo a la calle Francia. El Estado no rebatió la prueba presentada ni demostró justificación alguna para no conceder dicho acceso. El expediente está huérfano de prueba por parte del Estado que nos lleve a denegar la solicitud de los residentes de Jardines de Quintana. Entendemos que erró el foro apelativo intermedio

---

de agosto de 1989". Según las determinaciones de hechos del foro de instancia, en la actualidad la Administración de Vivienda Pública es la propietaria de las áreas comunes de la comunidad Jardines de Quintana.

al revocar en su totalidad la sentencia del Tribunal de Primera Instancia y ordenamos que se reestructure el sistema de control de acceso de manera que se conceda acceso peatonal y vehicular a la calle Francia a través de la calle Irlanda Oeste.

## VII.

Como cuarto señalamiento de error los peticionarios alegan que el Tribunal de Apelaciones se equivocó al resolver que el Estado es inmune a reclamaciones de daños y perjuicios al amparo de la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, y al revocar por esta razón la indemnización en daños concedida por el foro de instancia. 32 L.P.R.A. § 3077. Hemos leído y analizado con detenimiento la transcripción estipulada de la prueba oral vertida en la vista ante el foro de instancia y concluimos que los peticionarios no demostraron con hechos concretos los daños alegadamente sufridos. En vista de ello, resulta innecesario discutir este último planteamiento.

## VIII.

Por los fundamentos antes expuestos, revocamos la sentencia del Tribunal de Apelaciones y declaramos inconstitucionales las actuaciones de los funcionarios públicos aquí impugnadas. Ya anteriormente habíamos resuelto que el Estado debe establecer guías específicas para regir la conducta policial al detener vehículos de motor en un residencial público.[16] En este caso, el Estado no demostró que cumplió con este mandato. Por ello, le ordenamos adoptar, en el término de seis (6) meses, rigurosas guías limitativas de las actuaciones de los agentes del orden público en el sistema de control de acceso implantado en Jardines de Quintana y el Residencial Quintana al amparo de las órdenes ejecutivas antes mencionadas, conforme a lo que hemos explicado en esta Opinión. En ese plazo, el Estado deberá tomar las medidas necesarias para dar acceso a los residentes de Jardines de Quintana a la calle Francia a

través de la calle Irlanda Oeste. En cuanto a la remoción de la verja de cemento que alegadamente dividía el complejo de viviendas Jardines de Quintana del Residencial Quintana, no estamos en posición de proveer remedio alguno. Según las determinaciones del Tribunal de Primera Instancia, la verja tuvo que ser destruida para construir el segundo puesto de control de acceso [control 2]. Los peticionarios no demostraron mayores perjuicios por la ubicación de esta estructura de control de acceso. Por el contrario, esta era la única vía disponible para los residentes sin tarjeta de identificación.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

---

[16] <u>Pueblo v. Yip Berríos</u>, *supra*.

EL TRIBUNAL SUPREMO DE PUERTO RICO


Luis A. Nieves y otros

  Demandantes-Peticionarios

         v.

AM Contractors, Inc. y otros       CC-1998-154

    Demandados-Recurridos              Certiorari


SENTENCIA


En San Juan, Puerto Rico, a 2 de diciembre de 2005.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, revocamos el dictamen emitido por el Tribunal de Apelaciones y declaramos inconstitucionales las actuaciones de los funcionarios públicos aquí impugnadas. De conformidad, ordenamos al Estado adoptar, dentro del término de seis (6) meses, rigurosas guías limitativas de las actuaciones de los agentes del orden público en el sistema de control de acceso implantado en Jardines de Quintana y el Residencial Quintana, según explicado en la Opinión que antecede. En este mismo plazo, el Estado deberá tomar las medidas necesarias para conceder acceso peatonal y vehicular a los residentes de Jardines de Quintana a la calle Francia a través de la calle Irlanda Oeste.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez disiente

CC-2004-154                                                    3
sin opinión escrita. El Juez Asociado señor Rebollo López no

interviene.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo