# 2006 DTA 54

### TRIBUNAL DE CIRCUITO DE APELACIONES
### REGIÓN JUDICIAL DE SAN JUAN
### PANEL VI

CORPORACIÓN DEL CENTRO DE BELLAS ARTES LUIS A. FERRÉ
Peticionario

v.

PRODUCCIONES TROPICAL, INC.
Recurrido

Núm. KLCE-2005-01580

San Juan, Puerto Rico, a 28 de febrero de 2006

Panel integrado por su Presidente, el Juez Urgell Cuebas,
y los Jueces Gierbolini y Rodríguez Muñiz

Rodríguez Muñiz, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCIÓN

Comparece ante nos la Corporación del Centro de Bellas Artes Luis A. Ferrer (CBA) mediante recurso de *certiorari* presentado el 14 de noviembre de 2005. Solicita la revocación de la Orden emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 25 de octubre de 2005, notificada el 27 de octubre de 2005. Mediante dicha orden, el TPI declaró *"no ha lugar"* la solicitud de sentencia sumaria presentada por el CBA.

Por los fundamentos que expondremos a continuación, denegamos la expedición del auto de *certiorari*.

## I

El 14 de marzo de 2002, el CBA presentó demanda sobre sentencia declaratoria, *injuction* y daños contra Producciones Tropical, Inc. (Producciones Tropical). De las alegaciones surge que el 13 de marzo de 2001, Producciones Tropical sometió una Solicitud de Arrendamiento para utilizar la Sala de Festivales Antonio Paoli del CBA el 28 de marzo de 2002, para la presentación del grupo Monjes del Tibet. En respuesta a su solicitud, el 20 de noviembre de 2001, el CBA le cursó una carta a Producciones Tropical en la que le indicaba que se le había concedido del 26 al 28 de marzo de 2002, para el montaje, ensayo y presentación solicitada. El CBA le apercibió que en un término de diez (10) días laborables tenía que pagar un depósito y en sesenta (60) días antes de la presentación debía realizar el pago total y firmar el contrato. Posteriormente, el 4 de diciembre de 2001, el CBA le cursó una comunicación escrita a Producciones Tropical en la que le informó que el depósito ascendía a la cantidad de mil cuatrocientos ($1,400) dólares y que lo debía pagar en o antes del 6 de diciembre de 2001. De no cumplir con dicho pago, el CBA se reservaba el derecho de disponer de las fechas que le habían sido otorgadas. Del expediente surge que Producciones Tropical pagó el depósito el 7 de diciembre de 2001. ■ De acuerdo al CBA, Producciones Tropical tenía que pasar por las oficinas del CBA en o antes del 25 de enero de 2002, para realizar el pago total y firmar el contrato.

Conforme a las alegaciones de la demanda, el 16 de enero de 2002, la empresa David Maldonado Entertainment le remitió una carta al CBA indicándole que le interesaba utilizar las fechas del 27 al 28 de marzo del 2002, para presentar el espectáculo del cantante Domingo Quiñones. Por tal motivo, ésta había autorizado a Producciones Tropical que se hiciera cargo de la producción de dicho evento. Así las cosas, en esa misma fecha, Producciones Tropical le solicitó al CBA que autorizara un cambio de artista para la fecha del 26 al 28 de marzo de 2002, ya que en lugar del espectáculo de los Monjes del Tibet interesaba presentar el concierto del cantante Domingo Quiñones. Mediante carta de 24 de enero de 2002, el CBA le confirmó a Producciones Tropical que se había aprobado su petición de cambio de artista. El 25 de enero de 2002, Producciones Tropical sometió al CBA un formulario que contenía la información sobre la impresión de boletos para la presentación de Domingo Quiñones. La información de impresión de boletos indicaba que la fecha del espectáculo era el 28 de marzo de 2002 a las 8:30 p.m. ■ Cabe señalar que el 4 de marzo de 2002, Producciones Tropical le envió una carta al CBA en la que le solicitaba el uso de la Sala de los Espejos para los ensayos del cantante Domingo Quiñones los días 11, 18, 20, 25 y 26 de marzo en el horario de 7:00 p.m. a 10:00 p.m.

De otra parte, surge de las alegaciones que el 19 de febrero de 2002, el productor de espectáculos Cesár Sainz h/n/c Rompeolas (Sainz) le envió una carta al CBA para solicitar el uso de la Sala de Festivales para la fecha del 7 de abril de 2002, para la presentación del artista Luciano Pavarotti. Seguidamente, el 22 de febrero de 2002, Sainz presentó al CBA copia de la carta que le había enviado Elisa Wagner International Productions, representante de Luciano Pavarotti, en la que confirmaba que tenía interés en presentar a su artista el 7 de abril de 2002. El 26 de febrero de 2002, el CBA confirmó la fecha solicitada por Sainz y le advirtió que debía pagar el depósito en un término de diez (10) días laborables. Posteriormente, el 6 de marzo de 2002, Elisa Wagner International Productions se comunicó con Sainz para informarle que por razones médicas Luciano Pavarotti había solicitado que se cambiara su presentación para el 28 de marzo de 2002. Ante esta situación, Sainz le solicitó al CBA un cambio de fecha para la presentación del referido artista. Por su parte, el CBA le indicó que

la fecha del 28 de marzo de 2002, ya estaba separada para el espectáculo de Domingo Quiñones. En la alternativa, le sugirió las fechas del 21, 22 ó 23 de abril de 2002. De acuerdo a la demanda, Sainz inició conversaciones con Producciones Tropical con el propósito de llegar a unos acuerdos en cuanto a la fecha del 28 de marzo de 2002. Alegadamente, Sainz se comunicó con el CBA y le informó que existía *"99% de posibilidad de trabajar el miércoles 27 de marzo a Pavarotti"*. Ello así, el CBA contactó a Producciones Tropical para confirmar su disponibilidad de cambiar la fecha del 28 de marzo de 2002. No obstante, Producciones Tropical le informó que no había aceptado cambiar la fecha de su espectáculo. Tampoco había accedido a que el 27 de marzo de 2002, se llevara a cabo la presentación de Luciano Pavarotti, puesto que si así lo deseaba, podía abrir una nueva función en esa fecha para el artista Domingo Quiñones.

También surge de la demanda, que el 9 de marzo de 2002, el CBA le dirigió una carta a Producciones Tropical y a Sainz. En la misma, les informaba que le había concedido a Sainz el acceso a la Sala de Festivales Antonio Paoli el 26 de marzo de 2002, a partir de las 2:00 p.m. y hasta las 10:30 p.m. de ese día para el montaje, ensayo y función del espectáculo de Luciano Pavarotti. ■ Según el CBA, las razones para tomar tal decisión eran que alegadamente el contrato con Producciones Tropical no se había formalizado y que ésta no había solicitado el horario específico para el montaje de la presentación de Domingo Quiñones. En la carta, el CBA dispuso que Sainz tendría acceso a la sala para un ensayo aproximadamente a las 5:30 p.m. del 25 de marzo de 2002 y en esa fecha tendría disponible de 4:00 p.m. a 8:00 p.m. para incluir el montaje y desmontaje de una concha así como que el ensayo de Luciano Pavarotti. Sainz asumiría la responsabilidad económica de remover y reponer cualquiera de los elementos técnicos, luces, tramoya y sonido que fueran necesarios para el espectáculo de Domingo Quiñones y que se vieran afectados tanto por el ensayo del 25 de marzo de 2002 como por la función del 26 de marzo de 2002. También, Sainz tendría que asumir cualquier gasto fuera de los que bajo circunstancias normales se hubieran incurrido para cubrir el montaje de la primera función de Domingo Quiñones, incluyendo turnos técnicos luego de las doce de la noche.

En virtud de lo anterior, el CBA le solicitó al TPI que determinara que *"a tenor con las relaciones de dicha corporación con Producciones Tropical, Inc. y César Sainz h/n/c Rompeolas y de conformidad con las normas aplicables para la administración de la Corporación del Centro de Bellas Artes, dicha entidad aquí demandante actuó dentro de sus facultades al permitir la celebración de la actividad del Tenor Luciano Pavarotti el 26 de marzo de 2002"*.

Conjunto con la demanda, el 4 de marzo de 2002, el CBA presentó un escrito intitulado *"Moción Para Solicitar Vista Urgente y Remedio Provisional"*. Mediante el mismo, el CBA expuso que Producciones Tropical había exhibido un patrón de conducta que amenazaba con poner en riesgo la celebración del espectáculo de Luciano Pavarotti pautado para el 26 de marzo de 2002, a pesar de que se le había garantizado que dicha actividad no interferiría con la función de Domingo Quiñones del 28 de marzo de 2002. ■ Por tal razón, el CBA solicitó un remedio provisional a los efectos de evitar que en el último momento una controversia judicial o extrajudicial impidiera que se llevara a cabo el concierto de Luciano Pavarotti.

El 20 de marzo de 2001, Producciones Tropical presentó su contestación a la demanda. En lo pertinente, le solicitó al TPI que dictara sentencia declaratoria en la que determinara que el CBA había incurrido en incumplimiento de contrato. Según Producciones Tropical, el CBA había incumplido con los términos del contrato relacionado a la presentación del cantante Domingo Quiñones, interfiriendo así con sus derechos. Añadió, que el contrato entre el CBA y Sainz era un contrato en daño de tercero. Además, Producciones Tropical solicitó al TPI que incluyera a Sainz como parte indispensable en el caso. También solicitó que se declara sin lugar la solicitud de remedio provisional presentada por el CBA. De lo contrario, que se le ordenara al CBA presentar una fianza por la cantidad de doscientos cincuenta mil dólares ($250,000) por concepto de los daños que el remedio provisional pudiera causarle.

El 21 de marzo de 2002, notificada el 25 de marzo de 2002, el TPI emitió Resolución y Orden en la que

concedió el remedio provisional solicitado por el CBA. Dicho foro dispuso que se permitía la celebración del concierto de Luciano Pavarotti el 26 de marzo de 2002. El horario de ensayo y presentación sería de 2:00 p.m. a 10:30 p.m. Sainz se obligaba, y era en todo responsable incluyendo cualquier erogación económica, de remover y reponer todos los elementos técnicos necesarios de la producción de Domingo Quiñones. Además, tenía que tomar todas las medidas y asegurarse de que se cubriría y prepararía adecuadamente el montaje de las funciones que determinara presentar Producciones Tropical. Para el cumplimiento de lo anterior, se coordinarían los turnos técnicos que fueran necesarios incluyendo los turnos luego de las doce de la noche. El TPI dejó en vigor cualquier otro requerimiento que hubiera impuesto el CBA.

Luego de varios incidentes procesales interlocutorios que resultan innecesarios reseñar, el 9 de diciembre de 2003, notificada el 8 de enero de 2004, el TPI emitió Sentencia Parcial en la que desestimó el remedio interdictal instado y dispuso que el caso continuaría como uno de incumplimiento de contrato en una sala de asuntos civiles ordinarios.

**El 11 de enero de 2005, Producciones Tropical presentó reconvención en la que alegó que había sufrido daños por causa de la demanda instada por el CBA. A tal efecto, expuso que:**

*"... [L]a demandada se vio forzada a contratar los servicios de abogados por la cantidad de $20,000. En adición, la señora Ángeles García, en sus funciones oficiales para atender la demanda, se vio impedida de realizar trabajos relacionados a otras producciones por estar atendiendo todo lo concerniente a la demanda. Ello ocasionó una pérdida de por lo menos $15,000.00 a la parte demandada.*

*Las acciones torticeras de la demandante causaron que las ventas de taquillas del espectáculo del artista Domingo Quiñones se viera (sic) afectada (sic) e indirectamente dañó las posibilidades reales que se pudiera desarrollar interés público para abrir una segunda función, lo que atentó contra el prestigio artístico del cantante Domingo Quiñones y del profesionalismo de la señora Ángeles García como mujer productora y de Producciones Tropical, Inc. (sic) de múltiples presentaciones del cantante en Puerto Rico. Los daños causados a la parte demandante por este concepto se calculan en exceso de $50,000.*

*Las acciones torticeras y violación de contrato de la demandante, tal como se ha expuesto, tuvieron el efecto de ocasionarle daños a la reputación comercial de la demandada, no solamente frente al público, sino también ante sus clientes y auspiciadores. Los daños causados por este concepto se calculan en exceso de $50,000."* ■

El 3 de mayo de 2005, el CBA presentó *"Contestación A Reconvención"*.

El 7 de junio de 2005, el CBA presentó *"Moción de Desestimación y/o Para Que se Dicte Sentencia Sumaria"*. En lo pertinente, señaló que no había suscrito un contrato de arrendamiento con Producciones Tropical mediante el cual le hubiera concedido el uso de la Sala de Festivales Antonio Paoli para llevar a cabo una función, montaje o ensayo el 26 de marzo de 2002, según requieren las Normas de Arrendamiento. Según el CBA, esa fecha sólo fue separada de manera preliminar con respecto a la solicitud de arrendamiento que presentó Producciones Tropical para la presentación del 28 de marzo de 2002. Añadió que tenía la facultad para intercalar y permitir la celebración del concierto de Luciano Pavarotti.

El 1ro de septiembre de 2005, Producciones Tropical presentó *"Oposición a Moción de Desestimación y/o Para Que se Dicte Sentencia Sumaria"*. Mediante dicha moción, en lo pertinente, expuso que tenía reservada la Sala de Festivales para los días del 26 al 28 de marzo de 2002, que se imprimieron los boletos para el día 28 de marzo y que se comenzó a anunciar el concierto del 28 de marzo como única función. Añadió, sin embargo, que existía la intención de utilizar el 27 de marzo para una segunda función. Que el CBA le concedió tres (3) días, es decir, del 26 al 28 de marzo, pues era uso y costumbre conceder dos (2) días adicionales, ya que si se vendían

todos los boletos para la función del 28 de marzo, ésta podía optar por abrir una nueva función y utilizar la fecha del 26 de marzo para el montaje del espectáculo. Añadió, que era costumbre anunciar una *"única función"* como estrategia para acelerar la venta de boletos, ya que si se agotaban los mismos, se podía abrir una nueva función. Por otro lado, Producciones Tropical sostuvo que el CBA le había reservado las fechas siguiendo el proceso acostumbrado de presentar una solicitud y pagar el depósito, por lo tanto, se había perfeccionado un vínculo contractual entre las partes.

Transcurridos algunos incidentes procesales interlocutorios, el 25 de octubre de 2005, notificada el 27 de octubre de 2005, el TPI emitió Orden en la que declaró *"no ha lugar"* la solicitud de sentencia sumaria presentada por el CBA.

Inconforme con el dictamen del TPI, el 14 de noviembre de 2005, el CBA presentó recurso de *certiorari* en el que señaló la comisión de los siguientes errores:

*"PRIMER ERROR*

*ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL DENEGAR UNA SENTENCIA SUMARIA A PESAR DE NO EXISTIR CONTROVERSIA SUSTANCIAL DE HECHOS MATERIALES Y EL DERECHO A FAVORECER A LA PARTE PETICIONARIA, PROCEDIENDO LA CONCESIÓN DE LA SENTENCIA DECLARATORIA SOLICITADA.*

*SEGUNDO ERROR*

*ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL RESOLVER QUE EL PRODUCTOR CÉSAR SAINZ NO ES UNA PARTE INDISPENSABLE."*

## II

La parte que solicita una sentencia sumaria tiene que demostrar que no hay controversia real sustancial en cuanto a ningún hecho material y, que como cuestión de derecho, procede que el tribunal emita sentencia a su favor. *García Rivera et al. v. Enríquez*, 153 D.P.R.__; **2001 JTS 15**, a la página 820, Opinión de 2 de febrero de 2001; *P.A.C. v. E.L.A. I*, 150 D.P.R. 359, 374 (2000); *Pilot Life Ins. Co. v. Crespo Martínez*, 136 D.P.R. 624, 632 (1994).

La parte opositora, por su parte, tiene la obligación de contestar la moción en forma tan detallada y específica, como lo haya hecho la parte promovente. Como regla general, debe presentar contradeclaraciones juradas y contradocumentos que demuestren que existe una controversia real que debe ser dilucidada en un juicio. De no hacerlo, y si procediere en derecho, el tribunal deberá emitir sentencia sumaria en su contra. *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272, 281 (1990). El tribunal, al considerar una moción de sentencia sumaria: (1) analizará tanto los documentos que acompañen la moción en solicitud de la sentencia sumaria, como los documentos incluidos en la oposición y aquellos documentos que obren en el expediente del tribunal; (2) analizará los hechos de la forma más favorable para la parte que se opone; (3) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos; *Luán Invest. v. Rexach Const. Co.*, 152 D.P.R. 652, 665 (2000); (4) presumirá ciertos los hechos no controvertidos; *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735, 781 (1992); (5) hará un concienzudo examen de la situación de hechos hasta quedar convencido, hasta donde sea posible, de que tiene ante sí toda la verdad sobre los hechos; y (6) dictará sentencia según proceda en derecho. *Roth v. Lugo*, 87 D.P.R. 386, 396 (1963).

Por su propia naturaleza, ciertas controversias no son aconsejables resolverlas mediante sentencia sumaria, debido a que, difícilmente, pueda reunirse ante el tribunal toda la verdad de los hechos a través de declaraciones

juradas o deposiciones. En dichos casos, la credibilidad juega un papel esencial para llegar a la verdad y el litigante depende en gran parte de lo que extraiga del contrario durante el juicio. *Soto v. Hotel Caribe Hilton,* 137 D.P.R. 294, 301 (1994); *García López v. Méndez García,* 88 D.P.R. 363, 380 (1963).

De existir una disputa de hechos *bona fide,* no procede que los tribunales emitan sentencia sumariamente. Cualquier duda sobre la existencia de una controversia de hechos debe ser resuelta contra la parte que solicita la sentencia sumaria. Por lo tanto, sólo procede cuando los casos resulten claros, es decir, cuando el tribunal tenga ante sí la verdad sobre todos los hechos pertinentes. *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 D.P.R. 599, 610-611 (2000); *Cuadrado Lugo v. Santiago Rodríguez, supra,* a la página 279.

### III

En su escrito de revisión, el CBA señaló, como primer error, que el TPI incidió al denegar la solicitud de sentencia sumaria a pesar de que no existía ninguna controversia de hechos materiales.

El CBA alegó, en síntesis, que no había suscrito un contrato de arrendamiento con Producciones Tropical en el que se le concediera el uso de la Sala de Festivales Antonio Paoli para el ensayo, montaje o presentación de su artista el 26 de marzo de 2002. Según el CBA, las fechas del 26 al 28 de marzo se habían concedido a Producciones Tropical de forma preliminar, por lo que no le daba derecho a utilizar ilimitadamente dicha sala durante todos esos días. En todo caso, el uso de la sala tenía que estar específicamente autorizado mediante un contrato. También el CBA alegó que las Normas de Arrendamiento le facultaban ha intercalar otras actividades, según hizo con el evento de Luciano Pavarotti. Además, planteó que Producciones Tropical tuvo la oportunidad de solicitar funciones adicionales entre el 26 al 28 de marzo, según el procedimiento dispuesto en las Normas de Arrendamiento.

Por su parte, Producciones Tropical expuso en su alegato que desde el momento en que el CBA le concedió las fechas del 26 al 28 de marzo, surgió una obligación contractual que impedía que estas fechas fueran cedidas a cualquier otro productor de espectáculos, pues el proceso acostumbrado para las partes contratar era presentar una solicitud y pagar el correspondiente depósito.

En el caso de marras, el 13 de marzo de 2001, Producciones Tropical solicitó al CBA la separación del 28 de marzo de 2002, para el arrendamiento de la Sala de Festivales Antonio Paoli para la presentación de los Monjes del Tibet. Así las cosas, el CBA le concedió las fechas del 26 al 28 de marzo, para el montaje, ensayo y presentación de los mismos. Producciones Tropical tenía diez (10) días laborales para pagar el depósito y sesenta (60) días antes de la presentación para efectuar el pago total y firmar el contrato. Posteriormente, el 4 de diciembre de 2001, el CBA le envió una carta a Producciones Tropical en la que informaba que el depósito debía ser pagado en o antes del 6 de diciembre de 2001. De acuerdo a la carta, Producciones Tropical tenía que pasar por las oficinas en o antes del 25 de enero de 2002, para pagar el balance adeudado y firmar el contrato. Según el expediente, el 7 de diciembre de 2001, Producciones Tropical pagó la cantidad de mil cuatrocientos dólares ($1,400) de depósito.

El 16 de enero de 2002, Producciones Tropical solicitó al CBA un cambio, ya que le interesaba presentar el espectáculo de Domingo Quiñones en lugar de los Monges del Tibet. Según lo solicitado, el 24 de enero de 2002, el CBA aprobó el cambio.

Posteriormente, el 9 de marzo de 2002, el CBA cedió a Sainz la fecha del 26 de marzo para la presentación de Luciano Pavarotti, ya que alegadamente Producciones Tropical no había solicitado un horario para el montaje del espectáculo de Domingo Quiñones y no había formalizado el contrato de arrendamiento de las facilidades.

Según ya indicáramos, Producciones Tropical, en su oposición a solicitud de sentencia sumaria, alegó que

el CBA le había reservado las fechas del 26 al 28 de marzo siguiendo el proceso acostumbrado. Alegadamente, dicho proceso consistía en presentar la solicitud de arrendamiento ante el CBA, quien aprobaba la misma y concedía las fechas solicitadas. Luego se pagaba el depósito requerido por el CBA.

Conforme a lo anterior, forzoso es colegir que no procedía que se emitiera sentencia sumaria en el presente caso. Del expediente ante nos surge claramente que existe controversia de hecho entre otros en cuanto a: 1) cuál es el proceso acostumbrado y necesario para que las partes se obliguen entre sí; 2) si en efecto el CBA se obligó a concederle a Producciones Tropical las fechas del 26 al 28 de marzo.

Por otra parte, el CBA señaló como segundo error que el TPI incidió al resolver que Sainz no era parte indispensable en el caso.

Sobre el particular, del expediente surge que el 15 de marzo de 2002, el TPI emitió Orden en la que expuso, en lo pertinente, que estaría evaluando la necesidad de incluir como parte a Sainz. También surge que en la resolución emitida por el TPI el 21 de marzo de 2002, dicho foro en la nota alcalce número 2 expuso que *"… en vista de que los procedimientos a los fines de evaluar la solicitud de Sentencia Declaratoria continuarán, oportunamente el Tribunal resolverá lo relativo a si efectivamente el señor Sainz, (es) parte indispensable en la acción y si deberá incluirse formalmente a través de los mecanismos provistos por las Reglas de Procedimiento Civil. No obstante para los efectos de esta etapa de los procedimientos, ante su comparecencia y participación el Tribunal lo tiene por sometido a nuestra jurisdicción"*. ▮

Como cuestión de hecho, del expediente ante nuestra consideración no surge que el TPI haya resuelto finalmente si Sainz debe o no ser incluido como parte indispensable en el caso. Por ello, no nos corresponde resolver el asunto a nivel apelativo.

### IV

Por los fundamentos antes expuestos, denegamos el auto de *certiorari* solicitado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones